# Illinois Official Reports

## Appellate Court

---

### *People v. Beck*, 2017 IL App (4th) 160654

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM L. BECK, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-16-0654 |
| Filed | November 30, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Coles County, No. 14-CF-525; the Hon. Mark E. Bovard, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Lou J. Viverito, of Taylor Law Offices, P.C., of Effingham, for appellant.<br><br>Brian Bower, State's Attorney, of Charleston (Patrick Delfino, David J. Robinson, and Linda Susan McClain, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Steigmann and DeArmond concurred in the judgment and opinion. |

**OPINION**

¶ 1 Following a stipulated bench trial, defendant, William L. Beck, was found guilty of aggravated driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(d)(1)(C) (West 2012)) and sentenced to 30 months' probation. Defendant appeals, arguing the trial court erred by (1) denying his motion to suppress statements he made to a law enforcement officer, which he alleges occurred during the course of a custodial interrogation and without the benefit of *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), (2) denying his motion *in limine* to bar the State from presenting evidence at trial of the result of a blood draw performed during his hospitalization, (3) denying his motion *in limine* to bar the State from presenting at trial the results of a blood draw performed at the request of law enforcement, (4) denying his motion *in limine* to bar the State from offering expert opinion testimony on retrograde extrapolation, (5) overruling his objections to subpoenas *duces tecum* utilized by the State to obtain his hospital records, and (6) finding evidence relevant to the issue of proximate cause inadmissible. We affirm.

¶ 2                                I. BACKGROUND

¶ 3 On the evening of October 25, 2014, defendant, who was then 19 years old, was involved in a motor vehicle accident on a two-lane highway in Coles County, Illinois. The record reflects defendant's vehicle collided with a vehicle driven by Alyssa Camp. Both defendant and Camp sustained injuries in the collision and were transported to Carle Foundation Hospital (Carle) for emergency medical treatment. Coles County sheriff's deputy John Clough investigated the accident and, at Carle, issued defendant a traffic citation for DUI. In November 2014, the State charged defendant with two counts of aggravated DUI (625 ILCS 5/11-501(d)(1)(C) (West 2012)), alleging that he drove with a blood alcohol concentration (BAC) of 0.08 or greater (count I) or while under the influence of alcohol (count II) and was involved in a motor vehicle accident that resulted in great bodily harm to Camp and that his actions were the proximate cause of Camp's injuries.

¶ 4                            A. Pretrial Proceedings

¶ 5 The record reflects the trial court considered numerous pretrial motions filed by the parties, several of which are at issue on appeal. In April 2015, defendant filed a motion to suppress statements he made to Clough while hospitalized at Carle. Defendant alleged the statements concerned his consumption of alcohol on the day of the accident and were elicited by Clough during the course of a custodial interrogation and without the benefit of *Miranda* warnings.

¶ 6 From April to June 2015, defendant also filed a series of motions *in limine*, asking the trial court to exclude certain evidence from being offered by the State at his trial. Relevant to this appeal, he first asked the court to bar the State from offering evidence at trial of the result of a chemical analysis of a blood specimen (hereinafter hospital blood draw) obtained from him on the day of his accident, which was conducted at Carle. The record reflects the hospital blood draw occurred not long after defendant arrived at Carle on the day of the accident and yielded a serum BAC of 0.211. In support of his request, defendant asserted the hospital blood draw "was not conducted in accord with the statutory criteria for admissibility in evidence" because it was performed at the request of a law enforcement agency.

¶ 7        In a separate motion *in limine*, defendant asked the trial court to bar the State from offering evidence at trial of the result of a chemical analysis of a blood specimen (hereinafter law enforcement blood draw) taken from him on the day of the accident, which was conducted at the Illinois State Police (ISP) crime laboratory. The record shows the law enforcement blood draw was requested by Clough, collected at 3:25 a.m. on October 26, 2014, and yielded a whole BAC of 0.071. In support of his motion, defendant argued that Clough's decision to "charge" him with DUI was based upon the unauthorized disclosure to Clough of the hospital blood draw results. He maintained that, because the disclosure of those results was unauthorized, Clough lacked both the probable cause to charge him with DUI and the authority to obtain the law enforcement blood draw.

¶ 8        In a third motion *in limine*, defendant asked the trial court to bar the State from offering retrograde extrapolation opinion testimony at his trial. He argued that for a retrograde extrapolation calculation to be valid, two factors had to be established to a reasonable degree of scientific certainty: (1) the rate at which a person metabolized alcohol and (2) whether the person was in the post-absorption phase at the time of chemical testing. Defendant maintained that information disclosed by the State during discovery did "not provide sufficient information for a qualified witness to render an opinion, to a reasonable degree of scientific certainty, regarding" either factor.

¶ 9        In September 2015, the trial court conducted a hearing on defendant's motion to suppress and motions *in limine*. Clough testified regarding his investigation of the motor vehicle accident and his interactions with defendant. He stated he worked as a Coles County sheriff's deputy for 22 years and was the accident investigator for the sheriff's office. On October 25, 2014, he went to the scene of the accident and took measurements, examined skid marks, and spoke with witnesses. Based on his examination of the scene and witness statements, he determined that defendant's vehicle crossed into Camp's lane of travel, resulting in a head-on collision with Camp's vehicle. While at the scene, Clough was informed that Camp had sustained severe injuries and "they didn't know whether she would make it or not." He was also advised that the incident "was possibly a DUI investigation."

¶ 10        Clough testified that he went to Carle to further his investigation. Upon his arrival, he spoke with defendant's parents, Camp's parents, and emergency room staff. He also spoke with a nurse and inquired if any lab work had been performed by the hospital. Clough was shown test results indicating defendant had a blood alcohol result of 0.211. After receiving those results, Clough waited to speak with defendant, who was undergoing a medical procedure. He spoke with defendant's parents after obtaining the test results and agreed that he told them that defendant "was going to be charged with DUI." Clough testified that, prior to talking with defendant, he had been given information that led him to believe defendant had been drinking or that he was under the influence of alcohol.

¶ 11        Clough stated he first saw defendant in a bed in his hospital room. Defendant's parents were present and Clough believed a nurse was also in and out of the room. Clough testified he spoke to defendant briefly, asking him what happened, informing him that Clough "was go[ing] to charge him with DUI," and reading to him the "Warning to Motorist." More specifically, Clough testified that he read the warning to motorist to defendant at 1:45 a.m., then had an initial discussion with defendant "about drinking." Clough next asked defendant if he was willing to submit to testing of his blood and urine. Defendant consented to the testing, and Clough asked a nurse to "do a DUI kit." Because the emergency room was busy, blood was

not collected from defendant until approximately 3:25 or 3:26 a.m. While waiting on the nurse to obtain specimens from defendant, Clough and defendant had a further discussion about defendant's consumption of alcohol. During that conversation, defendant reported that he had been drinking at a party prior to the accident.

¶ 12 Defendant submitted the warning to motorist into evidence, which was signed by Clough and indicated it was issued to defendant at 1:45 a.m. on October 26, 2014. The initial sentence of the warning to motorist begins with the phrase "[s]ubsequent to an arrest for [DUI]" and contains various warnings regarding a DUI arrestee's driving privileges.

¶ 13 At the hearing, Clough acknowledged that he did not read defendant *Miranda* warnings prior to their discussions. Further, he agreed that he obtained defendant's driver's license while at the hospital and that defendant's license was retained "by the Court." Clough also issued two traffic citations to defendant. He testified he wrote the citations after midnight on the evening of the accident but prior to 1:45 a.m. the following morning and before reading the warning to motorist to defendant. Before leaving the hospital, Clough gave the citations to defendant's parents "because [defendant] was still being examined." He stated he gave the citations to defendant's parents after he read the warning to motorist to defendant and "would have handed all the paperwork [over] at the same time."

¶ 14 Defendant submitted copies of the citations issued by Clough into evidence. The record reflects the citations were for improper lane usage (citation No. 56321) and DUI (citation 56322). Under a section entitled "BOND," the improper lane usage citation indicated Clough obtained defendant's drivers' license and that bond was "POSTED ON TICKET NO. 56322." The DUI citation identified defendant's bond as a "NOTICE TO APPEAR."

¶ 15 Clough further testified that there was nothing to prevent a person from leaving defendant's hospital room and that no other law enforcement personnel were present while he spoke with defendant. He testified he never drew his weapon, placed defendant under arrest, restrained defendant in any way, or informed defendant that he was not free to leave the room. Clough stated he had to ask permission to see defendant in his hospital room and that "everyone consented." However, he agreed that he did not tell defendant he was free to leave the room.

¶ 16 Clough testified that, in connection with his investigation, he prepared an incident report and DUI questionnaire. On the questionnaire, he noted observing that defendant's eyes were bloodshot and glassy and that defendant smelled of an alcoholic beverage. Further, Clough agreed that he noted the date and time of defendant's "arrest" as October 26, 2014, at 1:45 a.m.

¶ 17 At the hearing, Bruce Gubbins testified he was a firefighter and paramedic for the city of Charleston, Illinois. On examination by defendant's counsel, he stated he responded to the crash scene and provided emergency medical services to defendant. When he arrived at the scene, defendant was "on kind of the edge of the road" and receiving treatment from first responders. He helped get defendant into an ambulance, checked defendant's vital signs, and performed multiple other assessments of defendant's condition. Gubbins testified that all of the assessments he performed were within normal ranges and remained within normal limits as defendant was transported to Carle. Gubbins observed that defendant had bruising around his left eye and Gubbins noted the presence of blood in defendant's left eye; however, defendant denied any head or neck pain or losing consciousness. According to Gubbins, defendant arrived at Carle at approximately 9:43 p.m., and ambulance personnel had radioed Carle's

emergency department in advance to provide them with information regarding defendant's condition.

¶ 18 On cross-examination by the State, Gubbins testified that although his evaluations of defendant were within the normal range, defendant was taken to the hospital due to "the mechanism of injury." He noted that in a serious car crash, which may have been at a high rate of speed or involved a sudden stop, there could be nonobvious injuries that require identification by X-rays or a physician. Gubbins noted that he observed seat belt bruising on defendant and the previously referenced injuries to defendant's face. Gubbins further testified that he recalled smelling alcohol on defendant. He stated he asked defendant about his consumption of alcohol because doctors want to know in case they have to give a patient certain medications. According to Gubbins, defendant reported that he "had maybe five beers" and Gubbins relayed that information to Carle's emergency room.

¶ 19 At the hearing, defendant further presented audio recordings from the Coles County 9-1-1 center, which occurred following the motor vehicle accident. The recordings indicated the 9-1-1 center was contacted by law enforcement and asked to contact Carle's emergency department with a request to draw defendant's blood. A dispatcher with the 9-1-1 center then contacted Carle and relayed the request to its emergency department, stating as follows: "[T]he deputies on scene are requesting that the male subject who's being transported, you guys get a blood draw from him." An unidentified individual from Carle's emergency department then responded "[y]eah, we usually always do."

¶ 20 At the conclusion of the hearing, the trial court took the matter under advisement. On September 11, 2015, it entered a written order. The record reflects the court denied defendant's motion to suppress statements he made to Clough, finding defendant was not in custody at the time he was questioned. Ultimately, defendant filed a motion to reconsider that decision, which the court also denied.

¶ 21 In its written order, the trial court also denied defendant's motion *in limine* to exclude evidence of the law enforcement blood draw. The court concluded that, at the time Clough arrived at Carle, he "was aware of multiple facts which provided him reasonable grounds to believe *** [d]efendant had been operating his vehicle while under the influence of alcohol." In particular, the court noted an eyewitness reported that defendant's vehicle crossed the centerline and struck Camp's vehicle head-on and first responders had reported defendant smelled of alcohol and that he admitted consuming beers before the collision. It concluded as follows:

"This information was sufficient to provide Clough with probable cause of a DUI offense having been committed, and, to warrant [Clough's] request for a DUI kit specimen. Even assuming *** that the [hospital blood draw] evidence was wrongfully obtained ***, or that [defendant's] statements are suppressed ***, Clough still had a reasonable basis to request the blood kit sample."

The court reserved ruling on defendant's motions *in limine* to exclude evidence of the hospital blood draw and retrograde extrapolation opinion testimony.

¶ 22 On October 2, 2015, defendant filed an objection to a subpoena *duces tecum*, issued at the State's request on September 30, 2015, and directed to Carle. He asserted the State's subpoena was overly broad because it sought the production of "all medical records from Carle pertaining to treatment" he received on October 25 and 26, 2014. He further argued the subpoena "was not issued in compliance with the Health Insurance Portability and

- 5 -

Accountability Act [of 1996 (42 U.S.C. § 201 *et seq.* (2012))] (HIPAA)." On October 8, 2015, the trial court conducted a hearing in the matter and overruled defendant's objection to the subpoena "subject to the records being produced to the [c]ourt for an *in camera* review."

¶ 23 On October 13, 2015, defendant filed an objection to a second subpoena *duces tecum* issued at the State's request on October 1, 2015. The subpoena was directed to Carle and sought the production of "[a]ny and all names of personnel" that treated defendant on October 25 and 26, 2014. Again, defendant argued the State's subpoena was overly broad and not issued in compliance with HIPAA.

¶ 24 On October 19, 2015, the trial court entered an order, stating it had received a response to the subpoena issued on September 30, 2015, which consisted of 144 pages of defendant's medical records from October 25 and 26, 2014. The court stated it had reviewed the records and found them relevant in consideration of issues posed by the pending motions *in limine*. The court ordered the records tendered to the State subject to 50 specific pages being withheld from production.

¶ 25 On October 23, 2015, the trial court conducted a further hearing on defendant's motion *in limine* to exclude retrograde extrapolation opinion testimony. The record shows the hearing addressed both the foundation for retrograde extrapolation evidence as well as the reliability of such scientific evidence under the *Frye* standard (*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)).

¶ 26 The State presented John Wetstein as an expert witness. Wetstein first testified regarding his education, training, and work experience. He stated he was employed by ISP for a total of 27 years, working as a bench level forensic toxicologist, an assistant laboratory director, and, for the previous 12 years, a toxicology training coordinator. As a training coordinator, Wetstein's primary responsibility was developing and implementing training programs in the area of toxicology. In 1987, he obtained a bachelor's degree in biological sciences and, in 1990 or 1991, he completed a graduate course in pharmacology. Wetstein had also completed a 12- to 18-month ISP toxicology training program. He described the field of toxicology as relating to the study of drugs, poisons, and metabolites and their effects on the human system. He stated he used his training on a daily basis.

¶ 27 Wetstein further testified he had previously been accepted as an expert witness in over 100 criminal court proceedings, providing testimony on forensic toxicology, retrograde extrapolation, and the pharmacology of drugs and abuse. He estimated he provided testimony on retrograde extrapolation on over 20 occasions. Because his job required him "to stay current," Wetstein stated he subscribed to the *Journal of Analytical Toxicology*, which he described as the "premier peer-reviewed publication" in the area of forensic toxicology. Based on this testimony and over defendant's objection, the trial court found Wetstein qualified as an expert witness in the subject of retrograde extrapolation.

¶ 28 Wetstein described retrograde extrapolation as "a mathematical process" and "a method of estimating an individual's [BAC] at an earlier point in time when it's known at a later point in time." He testified that retrograde extrapolation was an accepted method within the field of toxicology for determining an individual's BAC and "was first described in the 1930s." Wetstein asserted that the mathematics of a retrograde extrapolation calculation were pretty simple and at the level of "high school algebra."

¶ 29 At the State's request, Wetstein reviewed a file relating to defendant and the accident that occurred in October 2014. He reviewed documents, including a law enforcement narrative

report, "statements made," the hospital blood draw results, which he stated were obtained at 9:50 p.m. on the evening of the accident and demonstrated a serum BAC of 0.211, and the law enforcement blood draw obtained at 3:25 a.m. the morning following the crash and which showed a whole BAC of 0.071. Wetstein noted that a serum BAC cannot be directly compared to a whole BAC, and defendant's serum BAC had to be converted to a whole BAC for comparison purposes. From the results of defendant's hospital blood draw, Wetstein calculated a whole BAC of 0.178. Following that conversion, he was able to calculate defendant's alcohol elimination rate—the rate at which defendant's BAC dropped during the approximately 5½ hours between his two blood draws. Wetstein calculated defendant's alcohol elimination rate as 0.019. He testified the average elimination rate falls between 0.01 to 0.02 grams per deciliter per hour.

¶ 30    Wetstein next calculated defendant's BAC at the time of the accident, which he testified occurred at approximately 8 p.m. He relied on information from the law enforcement narrative report, including defendant's height, weight, and gender. He also relied on statements in the report that defendant consumed eight to nine beers between 5 and 7 p.m. on the day of the accident. Using that information, Wetstein concluded defendant's last drink was consumed by 7 p.m. Further, he opined within a reasonable degree of scientific certainty that defendant was in the "elimination phase" at the time of the accident rather than the "absorption phase." He testified as follows:

> "It is reasonable to assume that [defendant] was in the elimination phase at the time of the incident. There is approximately an hour between statements about when the last beer was consumed. There is nothing in that packet of data that would make me believe that the individual was not in the elimination phase.
>
> There's been sufficient time after social drinking that it's certainly reasonable to make the assumption that the individual is in the elimination phase at the time in question."

Wetstein testified that a retrograde extrapolation calculation required that an individual be in the elimination phase. If he reasonably believed defendant had been in the absorption phase at the time of the accident, he would not have offered an opinion on retrograde extrapolation. Ultimately, Wetstein calculated, within a reasonable degree of scientific certainty, that defendant's whole BAC at the time of the accident was 0.211 grams per deciliter.

¶ 31    Wetstein testified that he did not recall seeing any information about defendant's eating habits on the day of the accident in the materials he reviewed. On cross-examination, he testified that factors relevant to absorption included "how much you eat, what you ate, when you ate, what you're drinking, the period of time at which you drink it, [and] how much you drink." He agreed that it was fair to say that "[t]he most significant effect on alcohol absorption [was] the quantity of food substances ingested with or immediately prior to consumption of an alcoholic beverage." Wetstein also agreed that a large amount of food present in the stomach would delay the absorption of alcohol. If no food is present in the stomach the absorption rate is faster. Wetstein agreed that, as a matter of fact, he could not say when full absorption of alcohol occurred in defendant's case.

¶ 32    Defendant's counsel also questioned Wetstein regarding a State of Illinois Breath Analysis Operator Training manual. Wetstein indicated he was familiar with the manual but asserted it was "intended for a different target audience than [his] trainees." He did not completely agree with the following proposition contained in the manual: "As the alcohol moves from the

stomach or the small intestine into the bloodstream, the alcohol will be absorbed into the bloodstream in a period of 30 to 90 minutes, depending *** on the contents of the stomach, the size/weight of the individual[,] and the individual's state of health." In particular, he found it too broad and did not take into account "the breadth of studies" in the area of alcohol absorption. Wetstein noted that he reviewed absorption studies that mimicked social drinking situations, in that subjects were allowed to consume alcohol at their own preferred rate over a period of time. He testified, in those studies, "individuals [were] at or near their peak [BAC] within 15, 20 minutes of the cessation of drinking."

¶ 33 Wetstein further testified that alcohol elimination continued at a linear rate until it reached under 0.02, when it would become exponential. He stated he was familiar with Dr. Kurt Dubowski, a prominent researcher in the area of forensic toxicology. He agreed that Dr. Dubowski had published hundreds of articles on the subject of retrograde extrapolation and alcohol absorption and elimination. When asked whether he was aware that one of Dr. Dubowski's writings questioned whether elimination rates were linear, pseudolinear, or exponential, Wetstein asserted he did not believe there was "any doubt at this point in time that elimination rate is considered linear, particularly between 0.02 and *** 0.5."

¶ 34 Wetstein next testified he was also familiar with Dr. A.W. Jones, who had also authored articles on the subject of retrograde extrapolation. He stated he had read Dr. Jones's publications and did not doubt that Dr. Jones "characterized retrograde extrapolation as a dubious practice, owing to the many variables and unknowns involved." Wetstein acknowledged there were "valid reasons for [Dr. Jones] to make such a statement" and that "it would be very easy to overstate retrograde extrapolation if one isn't careful to express the limitations when they provide testimony."

¶ 35 On examination by the trial court, Wetstein agreed that it was fundamental to his calculation of defendant's BAC at the time of the accident that defendant was in the elimination phase when the accident occurred. He believed it was reasonable to find defendant was in the elimination phase at the time of the accident and agreed that his opinion was based on certain assumptions. He stated that, "in the absence of information," he assumed defendant had an empty stomach between 7 and 8 p.m.

¶ 36 On redirect examination, Wetstein testified that he believed there was a "general consensus in the forensic toxicology community that retrograde extrapolation, when applied appropriately, [was] quite reasonable." He did not believe any of the factors relied upon by Drs. Dubowski and Jones to find retrograde extrapolation "dubious" existed in the present case.

¶ 37 On further examination, Wetstein testified that, for purposes of his calculations, he assumed that defendant's intake of alcohol was spread out evenly over the reported period of time. He also assumed defendant consumed standard alcoholic drinks, which he described as "a 12-ounce serving of [4%] alcohol beer."

¶ 38 Following Wetstein's testimony, defendant submitted several exhibits into evidence, including a 2012 online article from *The Champion* magazine, entitled "Retrograde Extrapolation: A Scientifically Flawed Procedure (DWI)" and authored by Dominick A. Labianca; documents containing the credentials of both Dr. Dubowski and Dr. Jones; and the State of Illinois Breath Analysis Operator Training manual.

¶ 39    On November 10, 2015, the trial court entered a written order denying defendant's motion *in limine* to exclude retrograde extrapolation opinion testimony at defendant's trial. Initially, the court found retrograde extrapolation met the *Frye* standard, stating as follows:

"Wetstein testified that this calculation has been widely used in the field of forensic toxicology for decades and it has been accepted by its members. Case law bears this out. *** While [defendant] raises arguments challenging the reliability of such calculations because of the number of factors required to perform the calculations, this Court does not believe this deems the test unreliable. [Defendant] can point these out on cross[-]examination, but the evidence itself is admissible upon showing of proper foundation."

The court next found Wetstein was qualified to offer opinions on the subject of retrograde extrapolation given his education, training, and experience, and that his testimony on the subject was admissible at defendant's trial. It noted Wetstein determined that defendant had a normal or average elimination rate based on two blood draws and found it significant that Wetstein opined within a reasonable degree of scientific certainty that defendant was in the elimination phase at the time of the accident. The court further pointed out that, although defendant cast doubt on the accuracy of the information upon which Wetstein based his opinions, defendant could cross-examine Wetstein on those matters to discredit the weight of his testimony. Defendant filed a motion to reconsider the court's denial of his motion *in limine* to exclude retrograde extrapolation opinion testimony, which the court denied.

¶ 40    On December 22, 2015, defendant filed an objection to an additional subpoena *duces tecum* issued at the State's request on December 17, 2015. The subpoena was directed to Carle's Director of Health Information and sought "any medical records from Carle pertaining to treatment of [defendant] on October 25 [and] 26, 2014." Similar to his previous objections, defendant argued the subpoena was overbroad and not issued in compliance with HIPAA.

¶ 41    On December 29, 2015, the trial court conducted a hearing on several outstanding motions and heard evidence in connection with defendant's motion *in limine* to exclude evidence of the hospital blood draw. The State presented the testimony of Susan Freed, an Operations Manager for the Health Information Management Department at Carle. Freed testified that her department maintained Carle's medical records and processed records requests. She identified records pertaining to defendant and his treatment at Carle on October 25, 2014, and testified they were created in the regular course of business at Carle. Freed testified that the record showed the collection of a specimen from defendant on October 25, 2014, at 10:29 p.m. and that the specimen was tested in Carle's laboratory with a resulting value of 0.211. Ultimately, the trial court allowed defendant's medical records into evidence for purposes of the hearing over defendant's objection.

¶ 42    Cassandra Kocher testified she was a nurse in Carle's emergency department. On October 25, 2014, she was involved in defendant's medical treatment and drew blood from him that evening. Kocher testified she was not ordered by any law enforcement agency to perform the blood draw. Rather, she did so at the direction of the emergency room doctor, Dr. Danielle Hans. Kocher acknowledged that defendant's medical records reflected that she drew defendant's blood at 10:29 p.m. on October 25, 2014; however, she testified that the time "could have been off by maybe five minutes." Later, she identified 10:29 p.m. as the time defendant's blood was received by Carle's laboratory for testing.

¶ 43    Kocher further testified that she was aware defendant had been in a motor vehicle accident, and she stated that he acknowledged consuming alcohol. At the time she drew defendant's blood, there were not any police officers in defendant's room, and she had not spoken to any police officers about defendant's case. Kocher did not recall any reference to police officers requesting a blood draw. Further, she testified that she questioned defendant as to the last time he had anything to eat and "charted" that his last meal or intake of food occurred at 1400 hours, or 2:00 p.m. on the day of the accident.

¶ 44    On cross-examination Kocher testified that she had contact with defendant from 9:50 p.m. on October 25, 2014, until 1:30 a.m. on October 26, 2014. During that time, aside from diagnostic testing, she provided defendant with emergency medical care in the form of pain medication and a C collar. Diagnostic tests of defendant included an electrocardiogram of his heart, labs, the collection of a urine sample, a visit by the surgery resident, assessments of defendant's vital signs, and placement on a cardiac monitor. Kocher acknowledged that defendant was classified as "trauma green," the least severe trauma classification, both prior to his arrival at Carle and while in the emergency department.

¶ 45    Defendant presented the testimony of Dr. Nathan Compton, a general surgeon, and the court accepted Dr. Compton as an expert witness in emergency medical treatment. Dr. Compton testified that defendant's father was his first cousin and that he was asked to review documents with respect to defendant's emergency medical treatment at Carle. He testified defendant presented to Carle with stable vital signs and no obvious external injuries other than seat belt bruising. Dr. Compton stated that many blood tests are standard for a trauma scenario; however, he had never ordered a blood alcohol level test in such circumstances. He testified such testing "doesn't contribute to [the] diagnostic algorithm" and was "not going to change what you do for a patient in an acute trauma setting." Dr. Compton found nothing in defendant's condition when he was presented to Carle for treatment that necessitated a serum alcohol test. Further, he testified that medication used in an emergency setting would not "have any significant detrimental effect with an alcohol level."

¶ 46    Dr. Compton testified he also reviewed documentation regarding Carle's protocols for trauma patients. He stated a serum alcohol test was not consistent with Carle's protocols based on defendant's condition. He noted that in a "code red scenario," involving critical trauma injuries, obtaining a blood alcohol level was part of Carle's protocol; however, such testing did not "fall under" the green category, involving less critical injuries. Dr. Compton opined the serum alcohol testing performed on defendant at Carle was not done in the regular course of providing emergency medical treatment.

¶ 47    On cross-examination, Dr. Compton testified he consulted in a hospital emergency room approximately every other day regarding surgical issues but did not take care of patients as they were brought in to the emergency department. He testified that a 0.211 serum BAC was not concerning to him in a trauma setting. However, Dr. Compton did agree that a high speed, head-on, motor vehicle crash warranted emergency medical treatment.

¶ 48    At the conclusion of the hearing, the trial court took the matter under advisement. On January 5, 2016, the State filed a motion to reopen or, in the alternative, for leave to supplement evidence. It sought to introduce "additional foundational evidence" regarding the hospital blood draw in the form of testimony from Dr. Hans. The State attached Dr. Hans's affidavit to its motion, in which she averred that she was defendant's treating physician on October 25 and 26, 2014, and ordered, among other things, a 10-panel drug urine test and an

alcohol serum test. Dr. Hans stated the blood and urine testing was performed during the normal course of care and treatment of defendant for diagnosis and treatment purposes and not at the request of a police officer.

¶ 49    On January 12, 2016, the trial court conducted a hearing in the matter and denied the State's motion to reopen proofs and present Dr. Hans's testimony on the basis that it was untimely. It also denied defendant's motion *in limine* to exclude evidence of the hospital blood draw, finding the State had "sufficiently shown *** that [defendant's blood] was not taken at the direction of law enforcement." The court held "[t]he State would be allowed at the time of trial to introduce [evidence of the hospital blood draw] providing that it [could] at the time of trial establish the proper foundation as required" by the Vehicle Code. Defendant filed a motion to reconsider, which the court also denied.

¶ 50    On January 21, 2016, the trial court entered a supplemental ruling on defendant's objections to the State's subpoenas *duces tecum.* It noted its previous order on October 19, 2015, regarding Carle's records and that the State had requested that the court reconsider its ruling. The court then ordered all remaining Carle medical records, which it had previously ordered withheld, to be produced to the State. Defendant filed an objection to the release of defendant's previously withheld medical records, which the court overruled.

¶ 51    On April 7, 2016, defendant filed a motion *in limine*, asking the court to enter an order providing for "the admissibility at trial of evidence of the lack of use of a seat safety belt as it relates to the issue of proximate cause of the injuries." Defendant argued that information he obtained during discovery confirmed that Camp was not wearing her seat belt at the time of the accident and indicated that the accident would not have resulted in great bodily harm to Camp had she been wearing her seat belt. Thus, defendant maintained such evidence was "relevant to an essential element of the charges against him." On April 15, 2016, the State filed a motion *in limine* to preclude the use of seat belt evidence, arguing that evidence of a victim's failure to use a seat belt was inadmissible and irrelevant.

¶ 52    On May 3, 2016, the trial court conducted a hearing on pending motions, during which it denied defendant's motion *in limine* to allow evidence of seat belt usage at trial and granted the State's motion *in limine* to exclude such evidence.

¶ 53                          B. Stipulated Bench Trial

¶ 54    On June 20, 2016, defendant waived his right to a jury trial, and the parties agreed to proceed with a stipulated bench trial on only count I, charging defendant with aggravated DUI for driving with a BAC greater than 0.08. They further agreed that count II against defendant and a related traffic offense would be dismissed and that defendant intended to preserve issues and objections raised in his pretrial motions for appellate review.

¶ 55    The parties then presented stipulated facts to the trial court, which we summarize as follows. On October 25, 2014, at approximately 8 p.m., two eyewitnesses observed defendant's vehicle cross the center line of a two-lane highway and strike Camp's vehicle head-on. Following the accident, one of the eyewitnesses observed that defendant had extremely slurred speech. Two emergency medical technicians/paramedics who responded to the scene, Destiny Painter and Brandon Helm, began treating defendant and observed that he was disoriented, smelled of alcohol, had slurred speech, and exhibited a slow response to questioning. According to Painter, defendant acknowledged that he had been drinking that evening. Further, Helm would testify that defendant reported he had been drinking for the

homecoming festivities at Eastern Illinois University since 10 a.m. on the day of the accident. A photograph of the interior of defendant's vehicle showed a single Bud Light beer can on the floorboard.

¶ 56    The parties agreed ISP Master Sergeant Ryan Fuoss qualified as an expert in the field of crash reconstruction. Fuoss reviewed crash data retained by the internal computers, or black boxes, in both defendant's and Camp's vehicles. That data showed Camp's vehicle had been traveling at 55 miles per hour five seconds prior to the crash and 45 miles per hour two seconds before the crash. The black box in Camp's vehicle recorded lateral movement milliseconds prior to the crash, which was consistent with an attempt by the driver to avoid a collision. Data from the black box in defendant's vehicle showed he was traveling approximately 68 miles per hour two seconds before the crash. Also, defendant's vehicle "impacted and moved little from its original course," and data indicated there was no attempt by defendant to apply the brakes or swerve to avoid the accident. Fuoss opined defendant's vehicle crossed the center line of the two-lane highway and struck Camp's vehicle head-on.

¶ 57    Nurse Kocher would testify she treated defendant following the accident and noticed an odor of alcoholic beverage coming from his breath. According to Kocher, defendant admitted that he had been drinking prior to the crash. Additionally, at the direction of Dr. Hans, Kocher performed a blood draw on defendant "in the normal course of treatment and *** not *** at the request of law enforcement." Defendant's blood was tested in Carle's laboratory and resulted in a serum BAC of 0.211. Further, Kocher would testify that defendant reported he had not eaten since approximately 2 p.m. on October 25, 2014.

¶ 58    Dr. Hans treated defendant on October 25 and 26, 2014, for injuries he sustained in the crash. She ordered a 10-panel drug screen as well as a blood-alcohol test for defendant "in the normal course of treatment due [to] the nature of the incident that preceded his hospital visit." According to Dr. Hans, "no law enforcement officer or other hospital staff directed her to order the tests," which resulted in a serum BAC of 0.211.

¶ 59    Clough investigated the accident at the scene and then at Carle. He spoke with defendant in his hospital room while defendant's parents were present. According to Clough, defendant admitted that he drank eight to nine beers at a party before the accident and crossed the center line of the highway and struck Camp's vehicle. Clough observed that defendant's eyes were bloodshot and glassy and he smelled the odor of an alcoholic beverage on defendant's breath. Additionally, he asked a nurse at Carle, Gabrielle Waddington, to obtain a state-requested blood draw from defendant, and defendant consented. Due to the high-volume of emergency room patients, Waddington was unable to perform the blood draw until approximately 3:25 a.m. on October 26, 2014, approximately seven hours after the crash. Testing on the blood draw was performed at the ISP crime laboratory and yielded a whole BAC of 0.071.

¶ 60    The parties agreed that Wetstein, an ISP toxicologist, qualified as an expert in the field of toxicology. He reviewed police reports and blood examinations connected with the case, as well as a pretrial hearing transcript of Nurse Kocher's testimony, and provided opinion testimony on the subject of retrograde extrapolation. According to Wetstein, retrograde extrapolation was used to determine a BAC within a reasonable degree of scientific certainty for a previous period in time upon learning an individual's alcohol elimination rate. In defendant's case, he converted defendant's serum BAC of 0.211 to a whole BAC of 0.178. Wetstein then calculated defendant's elimination rate as 0.019 grams per deciliter, per hour, using considerations of defendant's height, weight, age, gender, and defendant's two separate

blood draws—the first occurring at 9:50 p.m. on October 25, 2014, and yielding a whole BAC of 0.178, and the second occurring at 3:25 a.m. on October 26, 2014, and yielding a whole BAC of 0.071. Based on defendant's elimination rate, Wetstein "calculated within a reasonable degree of scientific certainty that [defendant's] whole [BAC] at the time of the crash, [at] approximately 8:00 [p.m.] on October 25, 2014, was 0.211 grams per deciliter." According to Wetstein, statements made to Kocher at Carle showed defendant "was within the elimination phase of alcohol processing and that retrograde extrapolation calculations were accurate."

¶ 61 According to the stipulation, the State's evidence would also show that Camp was life-flighted by helicopter to Carle after the accident and underwent significant medical care and treatment. As a result of the accident, Camp had continuing medical problems and suffered brain damage with long-term and lasting effects.

¶ 62 The record reflects defendant also presented a stipulation of facts to the trial court, which was signed and agreed upon by the State. The stipulation included an offer of proof regarding the issue of proximate cause and the use of seat belts by defendant and Camp. It also indicated defendant's intention to preserve various pretrial issues for appellate review.

¶ 63 Following the parties' stipulations, the trial court found defendant guilty of aggravated DUI as charged by the State in count I. On July 19, 2016, defendant filed a motion for entry of a judgment of acquittal based on the alleged erroneous denials of his pretrial motions and objections. On August 11, 2016, the court denied defendant's motion for an acquittal and sentenced him to 30 months' probation. It also ordered that defendant pay restitution totaling $35,370.13 and serve 180 days in jail with credit for 50 days previously served, 122 days stayed, and the remainder served in four specific, 48-hour periods.

¶ 64 This appeal followed.

¶ 65                                  II. ANALYSIS
¶ 66                             A. Motion to Suppress
¶ 67 On appeal, defendant first argues that the trial court erred by denying his motion to suppress statements he made to Clough at Carle regarding his driving and consumption of alcohol on day of the accident. He contends his statements were made during a custodial interrogation and without the benefit of *Miranda* warnings.

¶ 68 We apply a two-part standard of review when considering a trial court's ruling on a motion to suppress. *People v. Seiler*, 406 Ill. App. 3d 352, 356, 943 N.E.2d 708, 712 (2010). Specifically, we will reject a trial court's factual findings only if they are against the manifest weight of the evidence, but will review the trial court's ultimate ruling *de novo*. *Id.* at 356-57, 943 N.E.2d at 712. "Where a defendant challenges the admissibility of a confession through a motion to suppress, the State bears the burden of proving the confession was voluntary by a preponderance of the evidence." *People v. Slater*, 228 Ill. 2d 137, 149, 886 N.E.2d 986, 994 (2008) (citing 725 ILCS 5/114-11(d) (West 2002)).

¶ 69 In *Miranda*, 384 U.S. at 444, the Supreme Court held that a defendant's statements are inadmissible when elicited during a custodial interrogation unless the State "demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The term "custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any

significant way." *Id.* Whether a person is in custody and subject to *Miranda* warnings requires consideration of the circumstances surrounding the interrogation and whether, under those circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave. *People v. Wright*, 2011 IL App (4th) 100047, ¶ 28, 960 N.E.2d 56. "With respect to the latter inquiry, the accepted test is what a reasonable person, innocent of any crime, would have thought had he or she been in the defendant's shoes." *People v. Braggs*, 209 Ill. 2d 492, 506, 810 N.E.2d 472, 482 (2003).

¶ 70　　Several factors are relevant to determining whether a defendant was in custody, including:

> "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of the individual's family and friends; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking, or fingerprinting; (5) how the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *Wright*, 2011 IL App (4th) 100047, ¶ 29, 960 N.E.2d 56 (citing *Slater*, 228 Ill. 2d at 150, 886 N.E.2d at 995).

See also *Braggs*, 209 Ill. 2d at 506, 810 N.E.2d at 482. Further, "[a]lthough it is generally irrelevant that the interrogating officer subjectively viewed the individual under questioning as a suspect, the officer's beliefs, if conveyed by word or deed to the individual being questioned, *are* relevant to the extent that they would affect how a reasonable person in the position of the individual being questioned would have gauged the breadth of his freedom of action." (Emphasis in original.) *Braggs*, 209 Ill. 2d at 506-07, 810 N.E.2d at 482.

¶ 71　　Here, defendant argues his statements to Clough are inadmissible because prior to questioning, Clough informed defendant that he intended to charge him with DUI, read him the warning to motorist, and issued him a DUI citation. He maintains such circumstances resulted in a "post-arrest interrogation," which was custodial for *Miranda* purposes, and rendered consideration of any other circumstances or factors unnecessary. We disagree with defendant's assertions on appeal. Although the circumstances he notes weigh in favor of finding that he was in custody for *Miranda* purposes, they are not dispositive nor do they preclude or prohibit the consideration of other relevant circumstances.

¶ 72　　Here, defendant was transported to Carle by ambulance, and Clough's questioning occurred in defendant's hospital room, a neutral setting. See *People v. Vasquez*, 393 Ill. App. 3d 185, 190-91, 913 N.E.2d 60, 66 (2009) (holding a hospital room was a neutral setting and that a suspect questioned in familiar or neutral surroundings "does not face the same pressures as one questioned in a police-dominated atmosphere"). Also present in the room were defendant's parents and, at times, hospital personnel. Clough testified he asked permission to see defendant in his hospital room and that "everyone consented." No other law enforcement personnel were present. Although Clough informed defendant that he intended to charge him with DUI, read to him the Warning to Motorist that contained warnings pertaining to a DUI arrest, and issued defendant a DUI citation, the record reflects there was no show of weapons or force and defendant was not fingerprinted, booked, handcuffed, or restrained in any way. The citations issued to defendant were uniform traffic citations. Notably, the DUI citation reflects defendant was provided with a "Notice to Appear" rather than required to post a cash bond, indicating he was not taken into custody by Clough and not being deprived of his freedom of action. The citations were also provided to defendant's parents rather than defendant.

¶ 73 Additionally, in examining whether defendant was in custody for *Miranda* purposes, the trial court determined "there was nothing significant about the time or length [of the questioning] which would otherwise create a custodial event. In fact, the interaction between *** Clough and [defendant] seemed to have been relatively minimal that day, primarily because of the treatment [defendant] was receiving." The court also found nothing about defendant's age or mental makeup that would have rendered him any more susceptible to construe his interaction with Clough as a custodial circumstance than any other person. These factual findings were not against the manifest weight of the evidence.

¶ 74 Under the facts presented, we find the majority of relevant factors weigh in favor of finding defendant was not in custody for purposes of *Miranda*. Moreover, we find the cases relied upon by defendant to support his position are significantly distinguishable from the present case.

¶ 75 Defendant first cites *Berkemer v. McCarty*, 468 U.S. 420, 423 (1984), wherein a law enforcement officer conducted a traffic stop on a vehicle driven by the defendant after he observed the defendant's vehicle weaving in and out of its lane of travel. During the traffic stop, the defendant failed sobriety tests and admitted to using intoxicants. *Id.* He was then "formally placed *** under arrest" and transported by patrol car to the county jail where he made additional incriminating statements when questioned by police. *Id.* at 423-24. At issue on appeal, was the admissibility of the defendant's pre- and postarrest statements to the officer, both of which were made without the benefit of *Miranda* warnings. *Id.* at 422-23. However, with respect to the defendant's postarrest statements, there was no dispute that they were made during a custodial interrogation; rather, the issue presented to the Supreme Court was whether an exception to *Miranda* should apply "[w]hen the police arrest a person for allegedly committing a misdemeanor traffic offense and then ask him questions without telling him his constitutional rights." *Id.* at 429. Ultimately, the Court concluded no such exception should apply. *Id.*

¶ 76 *Berkemer* involves circumstances where the defendant was "formally" arrested and questioned after having clearly been taken into custody by police. It simply does not address the circumstances presented by this case.

¶ 77 Defendant also cites *People v. Bahnfleth*, 233 Ill. App. 3d 289, 291, 599 N.E.2d 16, 18 (1992), which concerned the timing of a defendant's DUI arrest and refusal of chemical testing for statutory summary suspension purposes. In that case, the defendant was transported to the police station by squad car following a traffic accident and failed field sobriety tests. *Id.* at 291, 599 N.E.2d at 17. After failing those tests, a police officer informed the defendant "that they would have to charge him with DUI." *Id.* at 292, 599 N.E.2d at 18. On review, the Third District determined the defendant was under arrest at that point for purposes of summary suspension proceedings, finding "a reasonable person in the defendant's position would have concluded that he was not free to leave." *Id.*

¶ 78 Here, not only is *Bahnfleth* factually dissimilar from the present case, it is also distinguishable on the basis that it did not address or concern the issue of *Miranda* warnings and custodial interrogations. Although we do not disagree with the holding in *Bahnfleth*, we find it has limited application to the issues and circumstances presented here.

¶ 79 Further, like the trial court, we find the facts in this case are more similar to the circumstances presented in *Vasquez*, 393 Ill. App. 3d at 186, 913 N.E.2d at 62, which concerned the admissibility of statements a DUI defendant made to police while in the hospital

- 15 -

following a motor vehicle accident. There, police officers questioned the defendant in her hospital room several hours after the accident and after the defendant "had been ticketed for DUI and released on her own recognizance." *Id.* at 187, 913 N.E.2d at 63. After considering the factors relevant to determining whether an individual was in custody for *Miranda* purposes, the Second District determined the defendant in the case before it was not in custody and, thus, her statements to police were admissible at trial. *Id.* at 190, 913 N.E.2d at 65.

¶ 80      Similarly, in this case, we find the relevant factors weigh in favor of finding a reasonable person in defendant's position would have felt free to terminate Clough's questioning. As a result, defendant was not in custody when questioned by Clough in his hospital room, and *Miranda* warnings were not required. The trial court committed no error in denying defendant's motion to suppress and finding his statements to Clough admissible at trial.

¶ 81                                  B. Admissibility of the Hospital Blood Draw

¶ 82      On appeal, defendant next argues that the trial court erred in denying his motion *in limine* to bar evidence of his hospital blood draw. He maintains the State failed to meet the foundational requirements for the admissibility of such evidence as set forth in section 11-501.4 of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/11-501.4 (West 2012)).

¶ 83      On review, the trial court's ruling on a motion *in limine* will be upheld absent an abuse of discretion. *People v. Kirchner*, 194 Ill. 2d 502, 539, 743 N.E.2d 94, 113-14 (2000). However, "[t]o the extent that defendant's argument implicates the requirements of section 11-501.4, it presents a question of statutory interpretation, which we review *de novo*." *People v. Olsen*, 388 Ill. App. 3d 704, 709, 903 N.E.2d 778, 782 (2009) (citing *People v. Caballero*, 228 Ill. 2d 79, 82, 885 N.E.2d 1044, 1046 (2008)). "The primary rule of statutory construction is to ascertain and give effect to the legislature's intent, which is best determined by the statutory language's plain and ordinary meaning." *Id.* at 710, 903 N.E.2d at 782-83. "We will not depart from the statute's plain language by reading into the statute exceptions, limitations, or conditions that it does not express." *Id.* at 710, 903 N.E.2d at 783. Finally, we accept the trial court's factual findings unless they are against the manifest weight of the evidence. *Id.* at 709, 903 N.E.2d at 782.

¶ 84      Section 11-501.4(a) of the Vehicle Code provides that, in DUI prosecutions, blood tests performed for the purpose of determining alcohol content, which are "conducted upon persons receiving medical treatment in a hospital emergency room are admissible in evidence as a business record exception to the hearsay rule" when "the chemical tests performed upon an individual's blood *** were ordered in the regular course of providing emergency medical treatment and not at the request of law enforcement authorities." 625 ILCS 5/11-501.4(a)(1) (West 2012). The testing must also be "performed by the laboratory routinely used by the hospital." 625 ILCS 5/11-501.4(a)(2) (West 2012). "The purpose of section 11-501.4 is to insure the reliability and integrity of the test results conducted on a person charged with [DUI]." *People v. Lach*, 302 Ill. App. 3d 587, 594, 707 N.E.2d 144, 149 (1998). "By complying with the statute, the State demonstrates that reasonably protective measures have been taken to ensure that the blood taken from [the] defendant and tested in the hospital lab was not changed or substituted." *Id.*

¶ 85      Initially, defendant argues that, under section 11-501.4(a), a chemical test is inadmissible unless the State shows that it was ordered in accordance "with an established medical rule." He maintains "the statutory phrase 'the regular course of providing emergency medical treatment'

- 16 -

relates to a uniform standard applicable to emergency medical providers throughout the State of Illinois when 'providing emergency medical treatment.' " Further, defendant maintains the evidence in his case showed the chemical testing at issue was inconsistent with Carle's hospital protocol, given the severity of his injuries, and thus, evidence of the testing was inadmissible at his trial. We disagree.

¶ 86     Here, evidence presented to the trial court established defendant was taken to Carle's emergency department following the motor vehicle accident and provided treatment by Carle's emergency department personnel. Nurse Kocher testified she performed a blood draw on defendant shortly following his arrival at Carle at the direction of Dr. Hans, the emergency room doctor, rather than any law enforcement agency. According to the stipulated evidence at defendant's bench trial, Dr. Hans ordered the blood draw while treating defendant and "due to the nature of the incident that preceded his hospital visit," rather than at the request of law enforcement. Further, chemical testing on defendant's blood was performed in Carle's laboratory. We find such evidence was sufficient to meet the statutory requirements. See *Olsen*, 388 Ill. App. 3d at 710, 903 N.E.2d at 783 (rejecting an argument that section 11-501.4 required the testimony of a " 'physician, nurse, or other person with actual knowledge of routine emergency room procedures' " to establish a foundation for evidence of a hospital chemical analysis and finding the testimony of police officer and the manger of a hospital's medical records sufficient under the circumstances).

¶ 87     Further, we reject defendant's contention that the statute also required the State to present evidence of an established hospital protocol to support the chemical testing. Rather, evidence that chemical testing was ordered by an emergency department doctor while providing treatment to an individual in a hospital emergency room is sufficient to meet statutory requirements. While evidence of a hospital's standard protocols or general practices may also support the admission of chemical tests under section 11-501.4 (*People v. Hutchison*, 2013 IL App (1st) 102332, ¶ 20, 1 N.E.3d 600), the lack of such evidence does not warrant the exclusion of the chemical test. First, the language of the statute contains no such explicit requirement. Second, defendant's argument fails to take into account the exercise of independent judgment by an individual's treating physician. We find section 11-501.4 contemplates both situations when chemical testing is ordered pursuant to an established protocol or general practice and when the testing is ordered outside of such standard procedures but based on the independent judgment of the defendant's doctor while providing emergency medical treatment. Moreover such an interpretation is consistent with the purpose of section 11-501.4 to insure the reliability and integrity of testing results.

¶ 88     With respect to the hospital blood draw, defendant also argues his condition on October 25, 2014, was not serious and did not warrant emergency medical treatment. He maintains he was provided only non-emergency medical services. Again, we disagree. As stated, following the accident, defendant was treated in Carle's emergency department by emergency department personnel. Although his injuries were not severe, admissibility under section 11-501.4 is not based on the severity of injuries sustained or the extent of the emergency medical care received. We find it was enough under the statute that defendant's blood draw, taken for the purpose of chemical testing, was performed while he was receiving treatment in Carle's emergency room and from its emergency medical personnel.

¶ 89     Finally, defendant also argues that he presented evidence indicating the hospital blood draw was performed at the request of law enforcement. He cites evidence of the Coles County

9-1-1 center's recordings, showing that a dispatcher contacted Carle's emergency department to report that "deputies on scene" requested a blood draw on defendant. In making its ruling, the trial court addressed such evidence and determined as follows:

> "There is no indication who the receiving party at the Carle emergency department was of that phone call. I believe if I recall from the transcript itself, the person did indicate, [']yeah, we always do that['] or words to those effect. At the emergency department *** when the blood draw began we know that [defendant] had been involved in a significant motor vehicle accident, potential significant injuries both visible and not patent but internal. We know that [defendant] reported to have consumed alcohol. We also know or can conclude from the testimony that *** Clough was not yet present at Carle, and Nurse Kocher affirmatively indicated that she had not been contacted by Clough, and she had not been directed by law enforcement at the time of the first draw to take it.

> At this time the Court has considered all of the evidence and is going to find that the State has sufficiently shown for the purpose of the [m]otion in [l]imine that the tests were ordered in the regular course and not at the request of law enforcement."

¶ 90    Here, the trial court's factual findings are supported by the record and are not against the manifest weight of the evidence. While the evidence defendant presented indicated law enforcement desired a blood draw, the request was communicated to an unknown individual within Carle's emergency department. The evidence did not show that the request was then communicated to the individuals providing defendant's treatment or that the test was ordered pursuant to that request.

¶ 91    Additionally, as stated, the evidence at defendant's stipulated bench trial included a statement that Dr. Hans ordered defendant's blood-alcohol test in the normal course of treating defendant and "due to the nature of the incident that preceded his hospital visit." Moreover, she denied that she was directed to order the test by a law enforcement officer or hospital staff member. Such evidence supports the admissibility of defendant's hospital blood draw pursuant to section 11-501.4. On appeal, defendant argues that Dr. Hans's testimony was improperly obtained pursuant to the rule set forth in *Petrillo v. Syntex Laboratories, Inc.*, 148 Ill. App. 3d 581, 588, 499 N.E.2d 952, 957 (1986), which bars *ex parte* communications between an individual's treating physician and his legal adversary. However, to the extent he argues Dr. Hans's testimony should not have been admissible at trial, we find the issue forfeited.

¶ 92    During the underlying proceedings, the State moved to reopen or supplement the evidence it presented in connection with defendant's motion *in limine* to bar evidence of the hospital blood draw with either the affidavit or testimony of Dr. Hans. Defendant filed a written response asking the court to deny the State's motion to reopen or supplement on the basis that its request was untimely and its communications with Dr. Hans violated *Petrillo*. Ultimately, the court denied the State's motion on the basis of defendant's timeliness argument. Importantly, the record fails to reflect defendant raised the *Petrillo* issue in any other context. In particular, he never sought to bar Dr. Hans's testimony at trial as a sanction for a *Petrillo* violation. Such a request was never presented to the trial court and, therefore, the issue has been forfeited for purposes of appeal. *People v. Valdez*, 2016 IL 119860, ¶ 33, 67 N.E.3d 233 (holding issues not raised in the circuit court are forfeited on appeal).

¶ 93    Here, evidence of defendant's hospital blood draw was admissible under section 11-501.4 of the Vehicle Code. Further, the trial court committed no error in denying defendant's motion

*in limine* to exclude that evidence.

¶ 94                          C. Admissibility of the Law Enforcement Blood Draw

¶ 95       On appeal, defendant also challenges evidence of the law enforcement blood draw performed on him at Clough's request, which demonstrated a whole BAC of 0.071. He argues that Clough lacked probable cause to charge him with a DUI offense and, therefore, also lacked authority to request that defendant submit to law enforcement chemical testing of his blood under section 11-501.1 of the Vehicle Code (625 ILCS 5/11-501.1 (West 2012)). Defendant maintains the trial court erred by denying his motion *in limine* to bar the State from presenting such evidence at his trial.

¶ 96       Section 11-501.1(a) of the Vehicle Code (625 ILCS 5/11-501.1(a) (West 2012)), also known as the implied-consent statute, provides "that a defendant arrested for DUI is deemed to have given consent to chemical tests if he was driving upon the public highways." *People v. Hostetter*, 384 Ill. App. 3d 700, 713, 893 N.E.2d 313, 324 (2008). That section expressly states as follows:

"Any person who drives or is in actual physical control of a motor vehicle upon the public highways of this State shall be deemed to have given consent *** to a chemical test or tests of blood *** for the purpose of determining the content of alcohol *** in the person's blood if arrested, as evidenced by the issuance of a Uniform Traffic Ticket, for [a DUI] offense ***. If a law enforcement officer has probable cause to believe the person was under the influence of alcohol ***, the law enforcement officer shall request a chemical test or tests which shall be administered at the direction of the arresting officer." 625 ILCS 5/11-501.1(a) (West 2012).

¶ 97       "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *People v. Wear*, 229 Ill. 2d 545, 563, 893 N.E.2d 631, 642 (2008). "[T]he existence of probable cause depends upon the totality of the circumstances at the time of the arrest." *Id.* at 564, 893 N.E.2d at 642. Further, an arresting officer must have more than a mere suspicion but is not required to have evidence sufficient to convict. *People v. Fonner*, 385 Ill. App. 3d 531, 540, 898 N.E.2d 646, 654 (2008).

¶ 98       Additionally, a two-part standard of review applies to review of probable-cause determinations. *Id.* "Under that standard, a reviewing court gives deference to the trial court's findings of historical fact but prescribes a *de novo* standard of review for the ultimate determination of probable cause." *Id.*

¶ 99       Here, we agree with the trial court that Clough had probable cause to believe defendant had driven under the influence of alcohol. As noted by the court, Clough investigated the motor vehicle accident and determined a vehicle driven by defendant crossed the center line and struck Camp's vehicle head-on. Through his investigation, Clough learned the incident involved "possibly a DUI investigation." We note Gubbins, a first responder on the scene, testified at the hearing on defendant's motion that he observed the defendant's eyes as being bloodshot and glassy and that defendant smelled of an alcoholic beverage. Further, Clough testified he had been given information that led him to believe defendant had been drinking or was under the influence of alcohol prior to Clough seeing defendant in the hospital. Moreover, when Clough observed defendant, he also noticed that defendant had bloodshot and glassy eyes and smelled of an alcoholic beverage.

¶ 100    Finally, although not relied upon by the trial court, we find evidence of the results of the hospital blood draw would also have provided Clough with reasonable grounds to believe defendant committed a DUI offense. Upon his arrival at Carle and prior to seeing defendant, Clough inquired about the results of hospital lab work, and a nurse provided him with the results of defendant's hospital blood draw. Those results showed defendant had a serum BAC of 0.211 shortly following his arrival at Carle. As discussed, the results of a blood-alcohol test "conducted upon persons receiving medical treatment in a hospital emergency room for injuries resulting from a motor vehicle accident" must be disclosed to law enforcement upon request and are not subject to physician-patient confidentiality requirements. 625 ILCS 5/11-501.4-1 (West 2012). Contrary to defendant's arguments and for the reasons set forth above, the record fails to reflect defendant's hospital blood draw was wrongfully obtained or that it failed to meet the admissibility requirements of section 11-501.4.

¶ 101    Here, the record supports a finding that Clough had probable cause to issue defendant a DUI citation and request a blood draw. Thus, defendant's law enforcement blood draw was admissible in evidence at trial and the trial court committed no error.

¶ 102                        D. Retrograde Extrapolation Evidence

¶ 103    Defendant next argues that the trial court erred in denying his motion *in limine* to bar the State from presenting retrograde extrapolation evidence at his trial. He contends (1) the State failed to establish that retrograde extrapolation principles and methodology meet the standard for the admissibility of scientific evidence in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), (2) Wetstein was not qualified to offer expert opinion testimony on retrograde extrapolation, and (3) the State failed to establish a sufficient foundation for the admission of retrograde extrapolation evidence at his trial. For the reasons that follow, we disagree with each of defendant's arguments.

¶ 104                                1. Frye *Standard*

¶ 105    "In Illinois, the admission of scientific evidence is governed by the *Frye* standard," which has been codified in the Illinois Rules of Evidence. *In re Detention of New*, 2014 IL 116306, ¶ 25, 21 N.E.3d 406 (citing *In re Commitment of Simons*, 213 Ill. 2d 523, 529, 821 N.E.2d 1184, 1188 (2004), citing *Frye*, 293 F. 1013). Specifically, Illinois Rules of Evidence provide that "[w]here an expert witness testifies to an opinion based on a new or novel scientific methodology or principle, the proponent of the opinion has the burden of showing the methodology or scientific principle on which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs." Ill. R. Evid. 702 (eff. Jan. 1, 2011). Where scientific evidence has a history of legal challenges regarding its admissibility and has not been ruled upon in a *Frye* hearing in Illinois, the evidence is considered novel for *Frye* purposes. *People v. McKown*, 226 Ill. 2d 245, 258, 875 N.E.2d 1029, 1037 (2007) (hereinafter *McKown I*) (finding horizontal gaze nystagmus test evidence was novel under *Frye* despite its use by police officers for many years).

¶ 106    "A court may determine the general acceptance of a scientific principle or methodology in either of two ways: (1) based on the results of a *Frye* hearing; or (2) by taking judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject." *Id.* at 254, 875 N.E.2d at 1034. "General acceptance does not require unanimity, consensus, or even a majority, but does require something more than a scientific principle, technique or

methodology that is experimental or of dubious validity." *Detention of New*, 2014 IL 116306, ¶ 39, 21 N.E.3d 406.

¶ 107    At a *Frye* hearing, the State, as the proponent of scientific evidence, has the burden of demonstrating that it is generally accepted in the relevant scientific community. *People v. McKown*, 236 Ill. 2d 278, 294, 924 N.E.2d 941, 950 (2010) (hereinafter *McKown II*). A trial court's determination regarding either the necessity of a *Frye* hearing or whether there is general acceptance in the relevant scientific community is subject to *de novo* review. *Detention of New*, 2014 IL 116306, ¶ 26, 21 N.E.3d 406. In reviewing the trial court's determination "we may 'consider not only the trial court record but also, where appropriate, sources outside the record, including legal and scientific articles, as well as court opinions from other jurisdictions.' " *McKown II*, 236 Ill. 2d at 295, 924 N.E.2d at 950-51 (quoting *Simons*, 213 Ill. 2d at 531, 821 N.E.2d at 1189).

¶ 108    Here, Wetstein testified for the State that retrograde extrapolation was an accepted method of determining BAC in the field of toxicology. Defendant contends Wetstein, an ISP employee, was not an objective witness and that "the question of general acceptance must be determined from the testimony of experts and the literature in these scientific fields, and not from the testimony or writings of law enforcement officers or agencies" (*Id.* at 300, 924 N.E.2d at 953). However, the record reflects Wetstein was not a law enforcement officer, but a trained toxicologist with over 27 years of work experience in his field. Further, his testimony reflects he based his opinions on his training and experience, as well as his review of various studies and articles on retrograde extrapolation.

¶ 109    Moreover, as noted by the trial court, relevant case authority supports Wetstein's opinions. Although no Illinois case has expressly resolved the issue of the admissibility of retrograde extrapolation evidence under *Frye*, several appellate court decision favorably reference its use. See *People v. Floyd*, 2014 IL App (2d) 120507, ¶ 25, 11 N.E.3d 335 (recognizing that retrograde extrapolation has its place in DUI prosecutions); *People v. Ikerman*, 2012 IL App (5th) 110299, ¶ 38, 973 N.E.2d 1008 (stating "evidence regarding retrograde extrapolation is admissible as long as it is presented by a qualified expert"); *Petraski v. Thedos*, 382 Ill. App. 3d 22, 31-32, 887 N.E.2d 24, 34 (2008) (finding expert opinion testimony estimating BAC prior to a blood draw admissible in evidence); *People v. Latto*, 304 Ill. App. 3d 791, 803, 710 N.E.2d 72, 81 (1999) (finding no error in the admission of retrograde extrapolation evidence); *Cuellar v. Hout*, 168 Ill. App. 3d 416, 421, 522 N.E.2d 322, 325 (1998) (finding retrograde extrapolation evidence admissible); *People v. Johnigk*, 111 Ill. App. 3d 941, 944, 444 N.E.2d 739, 741 (1982) (finding evidence that estimated the defendant's BAC level at a time earlier than when the defendant's blood was drawn was admissible).

¶ 110    Courts in other jurisdictions have also found retrograde extrapolation evidence admissible and reliable. See *State v. Baucum*, 343 P.3d 235, 242 (Or. Ct. App. 2015) (concluding "that retrograde extrapolation—the mathematical process of plotting backwards a defendant's BAC on a BAC curve when given sufficient facts to do so—is generally accepted in the relevant scientific community and in the courts"); *State ex rel. Montgomery v. Miller*, 321 P.3d 454, 469 (Ariz. Ct. App. 2014) (holding retrograde extrapolation was "generally considered to be a reliable scientific discipline"); *Commonwealth v. Senior*, 744 N.E.2d 614, 620-21 (Mass. 2001) (holding evidence of retrograde extrapolation was sufficiently reliable); *State v. Jensen*, 482 N.W.2d 238, 239 (Minn. Ct. App. 1992) (holding that the principles underlying retrograde

extrapolation were not emerging or novel and that expert testimony on the subject was admissible).

¶ 111   We note defendant has not directed us to any case excluding retrograde extrapolation evidence on the basis that it lacks general acceptance in the relevant scientific community. Rather, cases excluding such evidence are largely based on foundational concerns, which would result in unfair prejudice to the defendant if the evidence was admitted at trial. See *Floyd*, 2014 IL App (2d) 120507, ¶ 20, 11 N.E.3d 335 ("A retrograde extrapolation calculation based on a single breath test, and when many of the factors necessary to determine whether the defendant was in the elimination phase are unknown, is insufficient to provide a reliable calculation and invites the jury to determine guilt on an improper basis."). Further, defendant presented a single article that was critical of the subject. As indicated, general acceptance does not mean total or unanimous acceptance. Thus, given the evidence presented in the underlying proceedings and our review of relevant case authority, we find retrograde extrapolation evidence as a method of estimating an individual's BAC has general acceptance in its relevant scientific community.

¶ 112                                      2. *Expert Witness Qualifications*

¶ 113   " 'In Illinois, generally, an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion.' " *People v. Lerma*, 2016 IL 118496, ¶ 23, 47 N.E.3d 985 (quoting *People v. Enis*, 139 Ill. 2d 264, 288, 564 N.E.2d 1155, 1164 (1990)). "There are no precise requirements regarding experience, education, scientific study, or training" of a proposed expert. *People v. Lovejoy*, 235 Ill. 2d 97, 125, 919 N.E.2d 843, 859 (2009).

¶ 114   "The decision to qualify a witness as an expert rests within the sound discretion of the trial court." *Id.* at 125, 919 N.E.2d at 858. An abuse of discretion occurs "only where the trial court's decision is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court." *Id.*

¶ 115   On appeal, defendant relies on the Fifth District's decision in *People v. Barham*, 337 Ill. App. 3d 1121, 788 N.E.2d 297 (2003), to support his position that Wetstein was not qualified to render opinions on retrograde extrapolation. There, the State's proffered witness, Cathy Anderson, had a bachelor's degree in zoology, was taking graduate courses in chemistry and biology at the time of trial, had completed an ISP toxicology training program, was certified to conduct alcohol and drug testing on biological samples, and was employed by ISP to test blood and other bodily fluids for the presence of alcohol and drugs. *Id.* at 1132, 788 N.E.2d at 306. Ultimately, the Fifth District found "Anderson was qualified to test blood samples for the presence of alcohol and other substances, to testify about the procedures used during those tests, and to testify to the results," but that no evidence indicated she "was qualified to explain retrograde extrapolation or to render any opinion regarding the rate of elimination of alcohol from the human system." *Id.* at 1133-34, 788 N.E.2d at 307. In so holding, it specifically determined no evidence was presented showing Anderson understood the process of alcohol elimination or relevant factors for consideration. *Id.* at 1134, 788 N.E.2d at 307-08.

¶ 116   We find *Barham* distinguishable from the present case. Here, evidence showed Wetstein worked as a toxicologist for ISP for a total of 27 years in various capacities. His most recent position involved developing and implementing training programs in the area of toxicology.

Wetstein held a bachelor's degree in biological sciences, completed a graduate course in pharmacology, and completed an ISP toxicology training program. He described the field of toxicology as relating to the study of drugs, poisons, and metabolites and their effects on the human system and stated he utilized his training on a daily basis. Additionally, Wetstein testified he had been accepted as an expert witness in over 100 criminal court proceedings, providing testimony on forensic toxicology, retrograde extrapolation, and the pharmacology of drugs and abuse. To stay current in his field, he subscribed to the *Journal of Analytical Toxicology*, which he described as the "premier peer-reviewed publication" in the area of forensic toxicology. Moreover, unlike Anderson's testimony in *Barham*, Wetstein's testimony in the underlying proceedings established his knowledge of and familiarity with the topics of alcohol absorption and elimination.

¶ 117    In this instance, the trial court determined that Wetstein—by his education, training, and experience—was qualified to render opinions on the topic of retrograde extrapolation. The record fails to reflect the court abused its discretion.

¶ 118                    3. *Foundation for Retrograde Extrapolation Testimony*

¶ 119    "To lay an adequate foundation for expert testimony, it must be shown that the facts, data, or opinions relied upon by the expert are of a type reasonably relied upon by experts in that particular field in forming opinions or inferences." *People v. Lind*, 307 Ill. App. 3d 727, 737, 718 N.E.2d 316, 323 (1999). Also, "[i]n addressing the admission of expert testimony, the trial court should balance the probative value of the evidence against its prejudicial effect to determine the reliability of the testimony." *Lerma*, 2016 IL 118496, ¶ 23, 47 N.E.3d 985. We review the trial court's determinations for an abuse of discretion. *Lind*, 307 Ill. App. 3d at 737, 718 N.E.2d at 323; *Lerma*, 2016 IL 118496, ¶ 23, 47 N.E.3d 985.

¶ 120    Calculations based on retrograde extrapolation principles require information on the rates at which a human body absorbs and excretes alcohol. *Floyd*, 2014 IL App (2d) 120507, ¶ 16, 11 N.E.3d 335 (citing *State v. Eighth Judicial District Court*, 267 P.3d 777, 780 (Nev. 2011)). "[R]ates can vary depending on a number of factors, including the elapsed time between a person's last drink and the blood test; the amount and type of alcohol consumed; the time period during which the alcohol was consumed; and personal characteristics such as age, weight, alcohol tolerance, and food intake." *Id.* Further, a reliable retrograde extrapolation calculation requires consideration of several factors, including the following:

> "(1) gender; (2) weight; (3) age; (4) height; and (5) mental state; (6) the type and amount of food in the stomach; (7) the type and amount of alcohol consumed; (8) the time the last alcoholic drink was consumed; (9) the subject's drinking pattern at the relevant time; (10) the elapsed time between the first drink and the last drink consumed; (11) the elapsed time between the last drink and the blood draws; (12) the number of samples taken; (13) the elapsed time between the offense and the blood draws; (14) the average alcohol absorption rate; and (15) the average elimination rate." *Id.* ¶ 17.

¶ 121    Additionally, "not every factor must be known to construct a reliable extrapolation; rather, the various factors must be balanced." *Id.* ¶ 25. "Whether the State produces a reliable extrapolation will depend on the specific circumstances of each case." *Id.*

¶ 122    On appeal, defendant argues Wetstein lacked an adequate foundation for his retrograde extrapolation calculations, as he made too many assumptions when forming his opinions. To

- 23 -

support his contentions, he cites *Floyd*, wherein the State also presented Wetstein as an expert witness on the subject of retrograde extrapolation. *Id.* ¶ 9. There, Wetstein provided an estimate of the DUI defendant's BAC based on a single breath test. *Id.* In the course of providing his calculations, "Wetstein acknowledged that he did not know what [the] defendant had eaten that night, how long she had been drinking, or what type of alcohol she consumed." *Id.* ¶ 11.

¶ 123    On review, the defendant challenged Wetstein's testimony on the basis "that, because Wetstein did not have information necessary to perform a retrograde extrapolation calculation with any degree of certainty, the prejudicial effect of his testimony outweighed its probative value." *Id.* ¶ 13. The Second District agreed with the defendant's argument, finding "[a] retrograde extrapolation calculation based on a single breath test, and when many of the factors necessary to determine whether the defendant was in the elimination phase are unknown, is insufficient to provide a reliable calculation and invites the jury to determine guilt on an improper basis." *Id.* ¶ 20. It found Wetstein's testimony was relevant but unreliable because too many of the factors relevant to a retrograde extrapolation calculation were unknown. *Id.* ¶ 23. The court noted Wetstein's calculation was "premised on the assumption that the defendant was in the elimination phase, without consideration of other relevant factors and without additional breath tests." *Id.* In particular, the evidence showed Wetstein "did not recall when [the] defendant started and stopped drinking" and his testimony failed to show he considered any relevant information before assuming that the defendant was in the alcohol elimination phase when her breath test was administered. *Id.*

¶ 124    Here, the trial court found *Floyd* factually distinguishable, and we agree. In this case, Wetstein's calculations were based on two blood draws rather than the single breath test at issue in *Floyd*. From those tests, taken approximately five and a half hours apart, Wetstein was able to determine defendant's actual elimination rate. Wetstein also had information in the materials provided to him regarding defendant's personal characteristics, including his height, weight, and gender. Further, he had information as to when the motor vehicle accident occurred and that defendant reported drinking eight to nine beers between 5 and 7 p.m. prior to the accident. Although Wetstein acknowledged that he made the assumption that defendant was drinking on an empty stomach, his conclusion that defendant was in the elimination phase at the time of the accident was otherwise based on relevant facts presented to him, including what defendant had been drinking and the time of his last drink.

¶ 125    Further, we agree with the trial court that Wetstein's opinions were not so flawed as to be inadmissible simply because he made certain assumptions or because defendant could cast doubt on the accuracy of information he relied upon. As determined by the trial court, such matters are subject to cross-examination and go to the weight of Wetstein's testimony. The court did not err in denying defendant's motion to bar retrograde extrapolation evidence.

### E. Defendant's Medical Records

¶ 127    Defendant next argues that the State was not entitled to access all of his confidential medical records pertaining to the treatment he received at Carle on October 25 and 26, 2014, which totaled 144 pages. He contends the State improperly obtained his medical records by way of three subpoenas *duces tecum* that were issued in violation of HIPAA. Further, defendant asserts that his medical records were not admissible in evidence.

- 24 -

¶ 128                          1. *HIPAA Procedures*

¶ 129        Initially, we address defendant's contention that the State lacked authorized access to his medical records because it failed to comply with HIPAA procedures. Although defendant does not cite to any particular HIPAA provision, he suggests that the State erred in not filing a motion for the issuance of its subpoenas *duces tecum* or seeking entry of HIPAA qualified protective orders.

¶ 130        "The appropriate procedure for obtaining medical records is through the use of a subpoena *duces tecum* commanding that the records be delivered to the court." *People v. Wilber*, 279 Ill. App. 3d 462, 465, 664 N.E.2d 711, 714 (1996). "This allows the court to conduct an *in camera* inspection to determine whether the records are privileged and also provides an opportunity for the defendant to challenge the release of the records." *Id.* at 465-66, 664 N.E.2d at 714.

¶ 131        Further, "HIPAA regulates the occasions when protected health information may be disclosed." *People v. Botsis*, 388 Ill. App. 3d 422, 435, 902 N.E.2d 1092, 1102 (2009). Relevant to this appeal, it provides for the disclosure of protected health information during judicial proceedings and in response to a subpoena under the following circumstances:

> "(A) The covered entity receives satisfactory assurance *** from the party seeking the information that reasonable efforts have been made *** to ensure that the individual who is the subject of the protected health information that has been requested has been given notice of the request; or

> (B) The covered entity receives satisfactory assurance *** from the party seeking the information that reasonable efforts have been made *** to secure a qualified protective order ***." 45 C.F.R. § 164.512(e)(1)(ii) (2014).

Additionally, "satisfactory assurance" under subsection (e)(1)(ii)(A) is deemed given if the party seeking the protected health information provides a written statement and accompanying documentation that it made a good faith attempt to provide written notice to the individual whose information is sought, the notice permitted the individual to raise an objection with the court, and the time for the individual to raise objections has elapsed with either no objections being made or when "[a]ll objections filed *** have been resolved by the court *** and the disclosures being sought are consistent with such resolution." 45 C.F.R. § 164.512(e)(1)(iii)(C)(*2*) (2014).

¶ 132        In *People v. Bauer*, 402 Ill. App. 3d 1149, 1158, 931 N.E.2d 1283, 1291 (2010), the Fifth District noted that "[a]lthough HIPAA provides for penalties against entities that fail to comply with its provisions [citation], law enforcement agencies, including the office of the State's Attorney, are not covered entities under HIPAA." Further, it noted that HIPAA did not contain a remedy for the suppression of protected health information that was obtained in violation of its procedures. *Id.* at 1158, 931 N.E.2d at 1292.

¶ 133        Here, the State acknowledges that it "did not pursue" defendant's medical records under HIPAA. However, consistent with *Bauer*, we find that to the extent defendant argues the State's access to his medical records was unauthorized and the information it obtained must be suppressed, we disagree. Moreover, the record reflects no prejudice to defendant from the procedure undertaken in this case. In particular, the record shows defendant was aware of the State's subpoenas and filed timely objections. The trial court addressed and considered defendant's objections and conducted *in camera* reviews of all of the challenged records. Ultimately, the court overruled defendant's objections and the records were released to the

State. Had the State complied with HIPPA requirements, the results would have been the same. See *People v. Wilson*, 164 Ill. 2d 436, 458, 647 N.E.2d 910, 921 (1994) (finding the defendant was not prejudiced by the process used to obtain his mental health records where the State could still have received the records if proper procedures had been followed).

¶ 134                    2. *Scope of the State's Medical Records Request*

¶ 135     With respect to defendant's argument concerning the scope of the medical records requested and obtained by the State, we note that, generally, physicians are prohibited from disclosing any information "acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve the patient." 735 ILCS 5/8-802 (West 2012). However certain exceptions apply to the general rule, including an exception under section 8-802(4) of the Code of Civil Procedure (Civil Code) (735 ILCS 5/8-802(4) (West 2012)) for actions "wherein the patient's physical or mental condition is an issue."

¶ 136     In *People v. Popeck*, 385 Ill. App. 3d 806, 807, 899 N.E.2d 324, 325 (2008), the State sought to obtain a DUI defendant's medical records by filing a motion for leave to issue a subpoena *duces tecum* and a HIPAA qualified protective order with the trial court. It sought medical records for treatment the defendant received on November 27, 2007, the date on which he was involved in a motor vehicle accident and charged with DUI. *Id.* The defendant objected to the State's request on the basis that only chemical tests could be released to the State. *Id.* Following a hearing, the trial court denied the State's motion on the basis that it was overbroad. *Id.* at 808, 899 N.E.2d at 326.

¶ 137     On review, this court reversed, finding section 8-802(4) of the Civil Code "allows release of medical information other than written results of [a] blood-alcohol test." *Id.* at 810, 899 N.E.2d at 327. Further, we rejected the defendant's argument that the State's subpoena was overly broad where it requested all of the defendant's medical records from the day he was treated for injuries following his motor vehicle accident. *Id.* at 810-11, 899 N.E.2d at 327-28 (stating that "[b]ecause access to [the] defendant's medical records solely for the date of the accident [was] relevant, material, and not privileged, the subpoena was sufficiently limited in scope and should have been granted"). In so holding, we agreed that in DUI cases "the medical staff's observations of [the] defendant on the date of the accident are relevant in determining whether [the] defendant was intoxicated." *Id.* at 810, 899 N.E.2d at 327.

¶ 138     Here, the State limited the information sought in its subpoenas to medical records for treatment defendant received immediately following his motor vehicle accident on October 25 and 26, 2014. As set forth in *Popeck*, section 8-802(4) permitted the release of such information and the State's requests were sufficiently limited in scope.

¶ 139                    3. *Admissibility of Medical Records at Stipulated Bench Trial*

¶ 140     Defendant further argues that all of his medical records were inadmissible at trial. He cites Illinois Rule of Evidence 803(6) (eff. Jan. 1, 2011) for the proposition that medical records cannot generally be admitted in criminal cases as a business record exception to the hearsay rule. In response, the State does not argue that defendant's medical records were admissible in evidence in their entirety. Rather, it contends that, even if error occurred, it is reasonable to assume that the trial court, as the trier of fact, disregarded inadmissible evidence in reaching its conclusion. See *People v. Naylor*, 229 Ill. 2d 584, 603, 893 N.E.2d 653, 665 (2008) ("[W]hen a

trial court is the trier of fact a reviewing court presumes that the trial court considered only admissible evidence and disregarded inadmissible evidence in reaching its conclusion.").

¶ 141    We note that evidence improperly admitted during a stipulated bench trial is subject to a harmless error analysis. *People v. Durgan*, 281 Ill. App. 3d 863, 868, 667 N.E.2d 730, 733 (1996). "Error is harmless if it did not contribute to the conviction, if other evidence in the case overwhelmingly supports the conviction, or if the evidence improperly allowed merely duplicated properly admitted evidence." *Id.*

¶ 142    At defendant's bench trial, the stipulation presented to the trial court by the State showed, that if the case proceeded to a jury trial, Tricia Truscott, Carle's Director of Health Information, would testify regarding defendant's medical records, identifying those records and confirming that they pertained to defendant's treatment at Carle. The stipulation also stated that "[t]he records would then be admitted into evidence."

¶ 143    Here, in challenging the admission of his medical records, defendant expressly references only medical records pertaining to his hospital blood draw and "the page with the last meal notation." However, as discussed, medical records associated with defendant's hospital blood draw were admissible in evidence. See 625 ILCS 5/11-501.4(a) (West 2012). Additionally, records containing information of defendant's last meal notation were cumulative of other evidence. Specifically, the stipulated evidence showed Nurse Kocher "would testify that [defendant] stated that he had not eaten since approximately 2:00 [p.m. on] October 25, 2014." Finally, we find that the record fails to show, and defendant fails to argue, that any other portion of his medical records contributed in any significant way to the trial court's finding of guilt. Thus, any error in the admission of defendant's medical records was harmless and does not require reversal of his DUI conviction.

¶ 144                    F. Admissibility of Seat Belt Evidence

¶ 145    Finally, on appeal defendant argues the trial court erred in precluding the use of seat belt evidence at his trial. He contends evidence showing Camp was not wearing her seat belt at the time of the accident, and that she would have sustained only minor injuries had she been wearing one was relevant to the issue of whether his conduct proximately caused Camp to sustain great bodily harm. Defendant maintains the court's ruling on the issue denied him the right to present a defense.

¶ 146    Again, issues involving statutory interpretation are subject to *de novo* review. *People v. Martin*, 2011 IL 109102, ¶ 20, 955 N.E.2d 1058; see also *People v. Way*, 2017 IL 120023, ¶ 18 ("[W]here the ruling on a motion *in limine* is based on an interpretation of law, *** review proceeds *de novo*."). "The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent, and the plain language of the statute is the best indication of that intent." *Martin*, 2011 IL 109102, ¶ 21, 955 N.E.2d 1058.

¶ 147    Here, defendant was convicted of aggravated DUI, in that he committed a DUI offense—in this case, driving with a BAC of 0.08 or greater (625 ILCS 5/11-501(a)(1) (West 2012))—and "was involved in a motor vehicle accident that resulted in great bodily harm *** to another, when the violation was *a proximate cause* of the injuries." (Emphasis added.) 625 ILCS 5/11-501(d)(1)(C) (West 2012).

¶ 148    Further, a DUI violation under section 11-501(a)(1) of the Vehicle Code (625 ILCS 5/11-501(a)(1) (West 2012)) is a " 'strict liability' offense[ ]" that does not require the State to

present proof of an individual's impairment. *Way*, 2017 IL 120023, ¶ 23. When an aggravated DUI charge is based on a violation of section 11-501(a)(1), it is only required that there be "a causal link *** between the physical act of driving and" the great bodily harm to another. *Martin*, 2011 IL 109102, ¶ 26, 955 N.E.2d 1058 (considering issues related to proximate cause and a "strict liability' " DUI, drug impairment offense).

¶ 149    "Generally, a 'proximate cause' is '[a] cause that directly produces an event and without which the event would not have occurred.' " *People v. Cook*, 2011 IL App (4th) 090875, ¶ 17, 957 N.E.2d 563 (quoting Black's Law Dictionary 234 (8th ed. 2004)). "Proximate cause 'is established if an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct.' " *Id.* ¶ 18 (quoting *People v. Johnson*, 392 Ill. App. 3d 127, 131, 924 N.E.2d 1019, 1022 (2009)).

¶ 150    In *People v. Merritt*, 343 Ill. App. 3d 442, 443, 797 N.E.2d 1103, 1104 (2003), the defendant appealed her aggravated DUI conviction, arguing that the State failed to prove that her alcohol consumption was a proximate cause of another's injuries. The underlying facts showed that the defendant's vehicle struck and killed the victim as he was jogging across a road at night. *Id.* at 443-44, 797 N.E.2d at 1104. On review, we held that "[t]he fact that the victim's actions were also a proximate cause of his injuries does not warrant reversal of defendant's conviction." *Id.* at 448, 797 N.E.2d at 1107. Specifically, we noted that "[a] person commits aggravated DUI when his or her driving under the influence 'was *a* proximate cause of the injuries' ***, not the sole and immediate cause of the victim's injuries." (Emphasis in original.) *Id.* (quoting 625 ILCS 5/11-501(d)(1)(C) (West 2000)).

¶ 151    Here, the plain language of the statute required only that defendant's conduct in driving while intoxicated was *a* proximate cause of Camp's injuries, not the sole or immediate cause. Stated another way, there had to be a causal link between defendant's physical act of driving and Camp's injuries. That Camp's own conduct contributed in some way to the injuries she sustained would not relieve defendant of criminal liability under the circumstances presented. Thus, the trial court's decision to preclude seat belt evidence from defendant's trial did not deny him the ability to present a defense and we find no reversible error.

¶ 152                                    III. CONCLUSION

¶ 153    For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal.

¶ 154    Affirmed.