2019 IL App (2d) 160766
No. 2-16-0766
Opinion filed June 5, 2019

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-3239 |
| RONALD Q. MAAS, | ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BURKE delivered the judgment of the court, with opinion.
Presiding Justice Birkett and Justice Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1    Police initiated a traffic stop of defendant, Ronald Q. Maas, who was 18 years old and driving a Ford Fusion, with his 15-year-old girlfriend, Elizabeth Zoph, as a passenger. Defendant sped away, and the car crashed and rolled over. The couple fled on foot and stole a Ford F-350 pickup truck. Defendant rammed the vehicle through a police roadblock and was shot in the face by an officer. Defendant sped away and police followed, but the chase ended when defendant crossed into oncoming traffic and collided head-on with a subcompact car, seriously injuring its two occupants, Helen Pecoraro and Richard Clark. The pickup rolled over and caught fire. Defendant abandoned Zoph, who was injured and unconscious, and hid behind a barn of a nearby residence.

¶ 2    Police discovered defendant behind the barn, attempting to drive away in a Ford F-550 dump truck. Defendant was arrested and transported to a hospital, where he tested positive for cocaine and heroin and had a blood alcohol concentration (BAC) of 0.13.

¶ 3    After a jury trial, defendant was convicted of aggravated possession of a stolen motor vehicle (aggravated PSMV) (625 ILCS 5/4-103.2(a)(7)(A) (West 2014)), aggravated driving with an alcohol concentration of 0.08 or more (aggravated DUI) (625 ILCS 5/11-501(d)(1)(C) (West 2014)), failure to report a motor vehicle accident involving personal injury (625 ILCS 5/11-401(b) (West 2014)), attempted theft (720 ILCS 5/8-4(a), 16-1(a)(1)(C) (West 2014)), two counts of aggravated assault (720 ILCS 5/12-2(c)(8) (West 2014)), and criminal damage to government supported property (720 ILCS 5/21-1.01(a)(1) (West 2014)). The trial court imposed an aggregate sentence of 22 years' imprisonment.

¶ 4    On direct appeal, defendant argues that (1) he was not proved guilty beyond a reasonable doubt of failing to report a motor vehicle accident involving personal injury, (2) the trial court erroneously admitted the hospital's chemical test results as records of emergency medical treatment under section 11-501.4 of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/11-501.4 (West 2014)), (3) the convictions of both aggravated DUI and aggravated PSMV violate the one-act, one-crime rule; and (4) the trial court erred in imposing consecutive sentences for aggravated DUI and aggravated PSMV. We affirm.

¶ 5                                    I. BACKGROUND

¶ 6                                    A. The Traffic Stop

¶ 7    At trial, Round Lake police officer Rick Tinsley testified that he observed the Fusion drive past him at a high rate of speed at 10:45 p.m. on November 13, 2014. Officer Tinsley tried to pull over the car. Defendant stopped but refused orders to exit the car and then sped away.

Officer Tinsley was eventually directed to stop his pursuit of defendant. Eric Anderson testified that he owned the Fusion and that the car had been stolen.

¶ 8 Round Lake police officer Kurtis Schultz corroborated Officer Tinsley's testimony regarding defendant's fleeing the traffic stop. After pursuing defendant for awhile, Officer Schultz was ordered to stop the pursuit. Soon thereafter, Officer Schultz learned that the Fusion had been reported stolen and that it had crashed.

¶ 9 Officer Schultz was notified via radio that another vehicle, the F-350 pickup, had been reported stolen near the site of the crash of the Fusion. Elzbieta Jakubiak testified that her husband, Roman, owned the F-350 pickup. She observed someone stealing the pickup around 11:30 p.m. on November 13, 2014, and woke Roman, who corroborated his wife's testimony at trial.

¶ 10 Officer Schultz went to the crash site, saw the F-350 pickup, and reported it to dispatch. Officer Schultz activated his emergency lights and siren and attempted to stop the pickup, but defendant sped away. Officer Schultz deactivated his emergency lights and siren, according to department policy not to engage in high speed chases relating to property thefts.

¶ 11 Officer Schultz continued to follow the F-350 pickup, which doubled back and almost struck his patrol car. The officer reactivated his lights and siren but deactivated them again after defendant failed to stop. The pickup cut across a lawn.

¶ 12                                  B. The Roadblock

¶ 13 The jury saw a video recording of part of the pursuit of the F-350 pickup, including as it approached the police roadblock at an intersection. The police vehicles had their lights activated, and the officers were on foot. Officer Schultz testified that he saw defendant back up near

Officer Shane Page. Defendant then pulled forward, pushed aside a red pickup truck, and sped away.

¶ 14    David Ashbacher testified that he was driving the red pickup around 11:10 p.m. on November 13, 2014. The F-350 pickup came "at a high rate of speed through the police blockade, and turned left, and then hit [him] head-on." The F-350 pickup pushed back Ashbacher's pickup and then backed up "a significant distance." The F-350 pickup accelerated again, rammed Ashbacher's pickup, and "pushed [it] down the highway." Ashbacher was dazed but remembered the sound of gunfire followed by silence. Ashbacher was diagnosed with a concussion, and his pickup was "totaled."

¶ 15    Officer Page testified that, at the roadblock, the F-350 pickup struck the squad car of Lake County sheriff's deputy Michael Kuvales. It also struck and moved Ashbacher's pickup. Officer Page drew a number of diagrams relating to how the F-350 pickup struck various other vehicles.

¶ 16    Officer Page testified that, after defendant backed into Deputy Kuvales' vehicle, defendant started to drive straight toward Officer Page. Defendant did not heed Officer Page's order to stop. Officer Page ran toward the side of the F-350 pickup and fired two shots from his pistol. The F-350 pickup struck Asherbach's pickup again. Officer Page knew that defendant had been wounded by his gunshots. Officer Page saw the reverse lights of the F-350 pickup and jumped over the guardrail. Officer Page believed that defendant intended to harm or kill him and the other officers.

¶ 17    Deputy Kuvales corroborated Officer Page's testimony. Deputy Kuvales pursued the F-350 pickup and attempted to pull it over by activating his lights and siren. Defendant did not

pull over. Deputy Kuvales was traveling 80 miles per hour, but defendant was pulling away from him.

¶ 18    The jury was shown a surveillance video of an attempt to pull over defendant. Deputy Kuvales observed the F-350 pickup cross over the center line and drive directly toward a marked Lake Villa squad car that had its emergency lights activated. The squad car had to brake and swerve to avoid being struck. Deputy Kuvales and other officers positioned their cars at an intersection to protect civilians. He was forced to move his car from defendant's path to avoid being struck. Deputy Kuvales also saw Officer Sciarrone move his vehicle to avoid being struck. Deputy Kuvales observed the F-350 pickup strike Ashbacher's pickup. The deputy identified pictures of the damage to his squad car.

¶ 19    Deputy Kuvales was forced to scramble out of his squad car with the aid of another officer, because the F-350's reverse lights came on and he believed that defendant would try to strike his squad car again. Deputy Kuvales observed the F-350 pickup hit Ashbacher's pickup a third time and push it aside as the F-350 pickup accelerated away from the intersection.

¶ 20                    C. The Collision With Pecoraro and Clark

¶ 21    Pecoraro and Clark were on their way to pick up her daughter from a hospital in Libertyville on the night of November 13, 2014. Clark was driving Pecoraro's Chevy Spark, a subcompact car. Traveling south, she suddenly saw the headlights of a truck approaching them head-on in their lane. Pecoraro testified that they were hit, her car spun around, and she was very sore. She asked Clark if he was okay and he said "no." Pecoraro stepped out of the car, but Clark was pinned inside. The next thing Pecoraro remembered was waking up in a health care facility in Libertyville. She did not remember first being at a hospital.

¶ 22    Pecoraro testified that her sternum, some ribs, and both feet were broken. She was confined to a wheelchair and needed diapers for four months. Two screws were placed into her toes, and she required extensive physical therapy. Pecoraro did not see Clark for several days. She had to purchase and move into a different home because she and Clark could no longer climb stairs. She could no longer work as a housekeeper.

¶ 23    Clark corroborated Pecoraro's description of the collision. He had worked as a foreman for a structural steel fabricator shop for 17 years but had been unemployed since the collision. Clark testified that he woke up in a hospital "with everything broken." Among his 27 broken bones were his jaw, eye socket, nose, arms, sternum, and multiple ribs. His leg "popped out" from the left side, and his right foot was crushed under the gas pedal. Clark noted scars on his jaw, over both eyes, on both arms, and on his left knee. He also had a plate with 13 screws in his left arm. His "collar" was "severed in half," and he had a plate and screws there as well. Clark underwent five surgeries on his right foot. He could not move his toes, and screws held his foot together. Clark incurred more than $400,000 in medical expenses.

¶ 24    Officer Eric McNeil testified that he responded to the incidents "occurring throughout the county." Officer McNeil joined the roadblock and activated his emergency lights. The F-350 pickup approached and did not stop. Officer McNeil and an officer in another vehicle traveled 80 miles per hour in pursuit of the F-350 pickup, but the truck was pulling away from them.

¶ 25    The F-350 pickup accelerated toward a curve in the road, and the officers decelerated as they approached. Officer McNeil recalled passing through the curve and driving through a cloud of debris and smoke. As he cleared the debris, Officer McNeil saw the F-350 pickup upside down with the engine on fire. The Spark was off to the side and appeared heavily damaged.

¶ 26    Officer McNeil helped Zoph crawl from the F-350 pickup. Pieces of both vehicles were strewn on the road. Clark had to be extricated from the Spark by the fire department.

¶ 27                                   D. The Arrest

¶ 28    James Johnson heard the collision from his home just after midnight. His stepson knocked on his bedroom door, stating that "something had happened outside." They heard "sirens and stuff coming." Johnson walked outside and saw about a dozen police officers with dogs in his driveway. Johnson testified that his Ford F-550 dump truck with a landscape maintenance trailer hooked up to it was on his property. He identified a picture of his F-550 truck with blood stains "all over the interior" and parts of the exterior. The police advised him to have the truck cleaned by a "hazmat" team, which he paid for.

¶ 29    Constance Couillard, Johnson's wife, corroborated his testimony. Hearing the collision, she walked outside, observed the police activity, and checked if the doors to their barn were closed. She heard "a very load moaning noise" coming from outside the rear of the barn. Constance testified that she was "terrified" and called 911. She entered the barn and locked the door.

¶ 30    Within a very short time, police officers with German shepherds came running up the driveway and asked where Constance had heard the noise. Before she could answer, the engine of the F-550 truck started. She told the officers that no one was supposed to be behind the barn. The officers ran toward the noise, and Constance ran back into her house.

¶ 31    Officer McNeil testified that the crash occurred at approximately 12:35 a.m. on November 14, 2014. He was unaware of defendant ever reporting that an accident had occurred. No one told the officer that defendant had made a report between 12:35 a.m. and 1:05 a.m. on November 14, 2014.

¶ 32    Defense counsel objected, but the trial court ruled that Officer McNeil's testimony was probative and not hearsay. The court characterized the question of what the officer might have heard as one of weight versus admissibility. The court stated, "I agree [that Officer McNeil's testimony] doesn't conclusively show [that defendant] didn't report [the accident], but I'm also aware that the fact is that [defendant] was hiding or trying to get another car on site here." The court then stated, "there isn't any real contention I've ever heard from the defense anywhere during this trial that [defendant] was doing anything but trying to get away or that he was reporting the accident when he was hiding and trying to steal the other car."

¶ 33    Officer McNeil testified that while the police were assessing the collision they were also looking for defendant, who had fled the scene. Deputy Joseph Paavilainen testified that he was dispatched at 1:20 a.m. to search for defendant. He and other officers found defendant in Johnson's F-550 truck. Defendant had managed to start the truck and was attempting to put it in drive. Deputy Paavilainen ordered defendant to exit the truck, but defendant refused. Defendant was pulled from the truck, taken into custody, and transported from the scene via ambulance.

¶ 34                        E. Zoph's Testimony

¶ 35    Zoph corroborated the officers' testimony. On the night of the incidents, defendant picked her up in the Fusion and they drove to a friend's house, where defendant drank at least half a bottle of rum and snorted heroin. They drove toward another friend's house, and a Round Lake police officer attempted to pull over defendant. Defendant stopped the car for a few seconds and then sped away. The Fusion eventually flipped over. Zoph and defendant ran through a cornfield and got into the F-350 pickup. Defendant drove toward Zoph's house, where the police were waiting. Defendant again sped away.

¶ 36    Zoph testified that defendant hit another vehicle and that the police "shot at [them]." Defendant pulled into a bar parking lot and Zoph noticed that he had been shot in the jaw and was bleeding profusely.  After they "sat back" in a neighborhood for about 30 minutes, defendant said that he wanted to go home.

¶ 37    Defendant drove toward Zoph's house again, and another police officer attempted to pull them over.  Defendant fled again, now driving "around 80 mph."  Defendant pulled around a slower vehicle, entered oncoming traffic, and struck the Spark "head-on."  Zoph remembered waking up inside the F-350 pickup with "fire around [her]."  Zoph testified that the F-350 pickup was upside down, she was injured and numb, and defendant was gone.

¶ 38                                F. Chemical Testing

¶ 39    Dr. William Watson testified that he was a staff surgeon as well as the medical director of trauma at Advocate Condell Medical Center in Libertyville.  Dr. Watson was working as the director of trauma in the early morning hours of November 14, 2014, and treated defendant.

¶ 40    Dr. Watson testified that, pursuant to hospital policy, certain chemical tests were performed on defendant, including white and red blood cell counts, liver tests, blood alcohol levels, urine toxicology, and clotting factors.  The tests were ordered by hospital staff, based on defendant's injuries and not at the request of any law enforcement agency.  The urine and blood samples were submitted to the hospital's in-house laboratory, which it regularly used.  The lab was accredited by the American Clinical Laboratory System.  Dr. Watson identified hospital records of defendant's toxicology and BAC.

¶ 41    The toxicology results demonstrated the presence of Tetrahydrocannabinol (THC), which is the psychoactive constituent in marijuana, and opioids.  Dr. Watson testified that heroin is an opiate.  Defendant's BAC was approximately 0.13, which exceeded the legal limit of 0.08.  Dr.

Watson testified that, although there is a way to screen blood for the presence of cannabinoids, cocaine, and opiates, the test would need to be conducted outside his hospital and it would take days to receive a result. Conversely, urine samples, which were assessed in this case, provide very accurate results and provide critical information "right away."

¶ 42    On cross-examination, Dr. Watson testified that he had never been qualified as an expert in toxicology or chemistry. Dr. Watson also claimed that chain of custody was not an issue in this case, because the tests were not requested by law enforcement. Dr. Watson was not familiar with the Illinois State Police guidelines regarding the collection of urine. Dr. Watson acknowledged that he did not know precisely what procedures were used to obtain and test the samples, but he "implicitly" trusted his "very well trained patient care techs." He explained that "we do this [approximately] 2,400 times a year." Dr. Watson conceded that he does not personally test urine and does not know what instruments, machines, computers or procedures are used to conduct the tests.

¶ 43    As noted, the jury verdict resulted in convictions of aggravated PSMV (625 ILCS 5/4-103.2(a)(7)(A) (West 2014)), aggravated DUI (625 ILCS 5/11-501(d)(1)(C) (West 2014)), failure to report a motor vehicle accident involving personal injury (625 ILCS 5/11-401(b) (West 2014)), attempted theft (720 ILCS 5/8-4(a), 16-1(a)(1)(C) (West 2014)), two counts of aggravated assault (720 ILCS 5/12-2(c)(8) (West 2014)), and criminal damage to government supported property (720 ILCS 5/21-1.01(a)(1) (West 2014)).

¶ 44                                    II. ANALYSIS

¶ 45    Defendant argues that (1) he was not proved guilty beyond a reasonable doubt of failing to report a motor vehicle accident involving personal injury, (2) the trial court erroneously admitted the chemical test results as records of emergency medical treatment under section 11-

501.4 of the Vehicle Code (625 ILCS 5/11-501.4 (West 2014)), (3) the convictions of both aggravated DUI and aggravated PSMV violate the one-act, one-crime rule, and (4) the trial court erred in imposing consecutive sentences for aggravated DUI and aggravated PSMV.

¶ 46                    A. Failure to Report the Collision With Pecoraro and Clark

¶ 47    Defendant contends that the State "introduced no evidence regarding lack of phone calls and no evidence regarding defendant's actions after being released from the hospital" and that, therefore, he was not proved guilty beyond a reasonable doubt of failing to report a motor vehicle accident involving personal injury.   Defendant implies that he could not make the required report before his release, because he was "hospitalized and incapacitated" after suffering a gunshot wound to his face and because he was arrested "immediately" after the accident.  We conclude that the evidence presented to the jury, viewed in the light most favorable to the prosecution, does not align with his account of events.

¶ 48    On a challenge to the evidence supporting a criminal conviction, a reviewing court does not retry the defendant.  *People v. Smith*, 185 Ill. 2d 532, 541 (1999).  "When reviewing the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  (Emphasis in original.)"  *People v. Bishop*, 218 Ill. 2d 232, 249 (2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  "Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt."  *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).  Our duty is to carefully examine the evidence while giving due consideration to the fact that the finder of fact saw and heard the witnesses.  The testimony of a single witness, if it is positive and the witness is credible, is

sufficient to convict. *Smith*, 185 Ill. 2d at 541. The credibility of a witness is within the province of the trier of fact, whose finding is entitled to great weight but is not conclusive. We will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Smith*, 185 Ill. 2d at 542. This standard of review applies regardless of whether the evidence is direct or circumstantial and regardless of whether the defendant was tried before the bench or a jury. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

¶ 49    Defendant was convicted of failing to report the head-on collision resulting in Clark's and Pecoraro's physical injuries. See 625 ILCS 5/11-401(b) (West 2014). Section 11-401(a) of the Vehicle Code provides generally that the driver of any vehicle involved in a motor vehicle accident resulting in personal injury must stop and remain at the scene of the accident. 625 ILCS 5/11-401(a) (West 2014). Section 11-401(b) provides that a driver who does not remain at the scene must timely report the accident, and the report's timeliness depends on whether the driver was hospitalized and incapacitated:

> "Any person who has failed to stop or to comply with the requirements of paragraph (a) shall, as soon as possible but in no case later than one-half hour after such motor vehicle accident, or, if hospitalized and incapacitated from reporting at any time during such period, as soon as possible but in no case later than one-half hour after being discharged from the hospital, report the place of the accident, the date, the approximate time, the driver's name and address, the registration number of the vehicle driven, and the names of all other occupants of such vehicle, at a police station or sheriff's office near the place where such accident occurred."  625 ILCS 5/11-401(b) (West 2014).

¶ 50     In addition to remaining at the scene, motorists involved in an accident must exchange information and render aid.

"The driver of any vehicle involved in a motor vehicle accident resulting in injury to or death of any person or damage to any vehicle which is driven or attended by any person shall give the driver's name, address, registration number and owner of the vehicle that the driver is operating and shall upon request and if available exhibit such driver's license to the person struck or the driver or occupant of or person attending any vehicle collided with and shall render to any person injured in such accident reasonable assistance, including the carrying or the making of arrangements for the carrying of such person to a physician, surgeon or hospital for medical or surgical treatment, if it is apparent that such treatment is necessary or if such carrying is requested by the injured person.

If none of the persons entitled to information pursuant to this Section is in condition to receive and understand such information and no police officer is present, such driver after rendering reasonable assistance shall forthwith report such motor vehicle accident at the nearest office of a duly authorized police authority, disclosing the information required by this section."  625 ILCS 5/11-403 (West 2014).

¶ 51     Defendant was convicted of a violation of section 11-401(b) in that he failed to report the accident in which Clark and Pecoraro were personally injured.

¶ 52     Defendant and the State dispute when the 30-minute reporting period commenced:  after the collision or after defendant's discharge from the hospital.  In arguing that the State was required to prove that he failed to report within one-half hour after his release from the hospital, defendant suggests that he was shot just before the collision and hospitalized immediately after the collision.  However, the evidence shows that he had ample opportunity to make a report

before he was arrested. The reporting grace period based on hospitalization and incapacitation was not available to defendant.

¶ 53    After the Fusion rolled over, defendant and Zoph fled on foot through a cornfield and stole the F-350 pickup. Defendant responded to multiple attempts to pull over the F-350 pickup by engaging in a number of high-speed chases and striking police vehicles. Defendant rammed through the roadblock and suffered a gunshot wound to his face, after which he and Zoph hid in the F-350 pickup for more than 30 minutes. Defendant engaged in a final high-speed chase before crashing head-on with Clark and Pecoraro.

¶ 54    Defendant was not arrested "immediately" after the crash. He fled on foot, leaving Zoph in the F-350 pickup, which was burning. Defendant did not seek medical assistance but rather tried to escape by attempting to steal another truck before finally being apprehended. He was neither hospitalized nor incapacitated within 30 minutes after the collision.

¶ 55    Specifically, Officer McNeil testified that the crash occurred at approximately 12:35 a.m. and that he was certain that defendant did not make a report within 30 minutes of the crash. Defendant does not renew his trial objection to this testimony, but rather argues that it does not prove the absence of a report. As the trial court observed in overruling the objection, Officer McNeil's testimony did not conclusively establish that defendant failed to report, but the surrounding circumstances support the reasonable inference that defendant was attempting to flee and elude the police the entire evening and never intended to report the accident.

¶ 56    Defendant's initial interaction with the police was his attempt to elude Officer Tinsley's traffic stop of the Fusion. Desperate to elude the police, defendant drove so recklessly that multiple officers abandoned the pursuit and he eventually caused the car to roll over. He abandoned the Fusion, ran across a field, and stole the F-350 pickup. In this stolen vehicle,

defendant repeatedly rammed a roadblock, nearly ran over an officer, and sped away, despite being shot in the face. Defendant pulled into a parking lot, hid for 30 minutes, and then drove toward Zoph's house. During the ensuing chase, defendant accelerated to at least 80 miles per hour, crossed into oncoming traffic, and collided with Clark and Pecoraro. Defendant abandoned Zoph in the burning and overturned F-350 pickup.

¶ 57 Deputy Paavilainen was dispatched to the area sometime after roll call at 1:20 a.m., which was more than 30 minutes after the collision. He and other officers found defendant hiding behind a barn, in the F-550 truck, attempting to put it in drive. Defendant had to be pulled from that vehicle and forcibly transported to the hospital. This is the context from which the jury made the reasonable inference that defendant did not report the collision with Clark and Pecoraro within 30 minutes. Despite his transfacial gunshot wound, defendant was not so incapacitated that he could not report the accident. When considering all of this evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See *Cunningham*, 212 Ill. 2d at 278.

¶ 58                                   B. Chemical Test Results

¶ 59 Defendant next argues that the trial court erroneously admitted hospital records of his BAC and toxicology under section 11-501.4-1 of the Vehicle Code (625 ILCS 5/11-501.4-1 (West 2014)) and restricted cross-examination of Dr. Watson regarding alleged noncompliance with section 11-501.2 (625 ILCS 5/11-501.2 (West 2014)). Defendant claims that "[w]hile [section 11-501.4] may permit the admission of hospital records, it does not permit the admission of hospital records that fail to reveal compliance with [section 11-501.2]." (Emphasis omitted.)

¶ 60    We note that, despite defendant's reference to section 11-501.4-1, his quarrel actually is over section 11-501.4, which governs the admissibility of chemical tests of blood or urine conducted in the regular course of providing emergency medical treatment.  Section 11-501.4-1, by contrast, provides for the disclosure of such test results to the Department of State Police or local law enforcement agencies upon request.  Defendant does not claim that law enforcement obtained the results unlawfully.

¶ 61    On review, a trial court's admission of BAC and toxicology evidence in a DUI prosecution will be upheld absent an abuse of discretion.  *People v. Beck*, 2017 IL App (4th) 160654, ¶ 83 (citing *People v. Kirchner*, 194 Ill. 2d 502, 539 (2000)).  However, to the extent that the parties dispute the applicability of sections 11-501.4 and 11-501.2, we are presented with questions of statutory interpretation, which are reviewed *de novo*.  *Beck*, 2017 IL App (4th) 160654, ¶ 83.  The primary rule of statutory construction is to ascertain and give effect to the legislature's intent, which is best determined by the plain and ordinary meaning of the statutory language.  We will not depart from the statute's plain language by reading into the statute exceptions, limitations, or conditions that it does not express.  *Beck*, 2017 IL App (4th) 160654, ¶ 83.

¶ 62    Defendant argues that the test results must be excluded because the State failed to comply with section 11-501.2, which generally governs the admissibility of such results in DUI prosecutions.  625 ILCS 5/11-501.2 (West 2014).  He relies on *People v. Hall*, 2011 IL App (2d) 100262, in which the State appealed the exclusion of BAC evidence in a DUI prosecution.  In *Hall*, the prosecutors became aware that blood samples were available at the hospital and directed that the samples be tested at the state lab.  *Hall*, 2011 IL App (2d) 100262, ¶ 4.

¶ 63  The *Hall* court observed that, to be considered valid under the statute, a blood analysis " 'shall have been performed according to standards promulgated by the Department of State Police.' "  *Hall*, 2011 IL App (2d) 100262, ¶ 10 (quoting 625 ILCS 5/11-501.2(a)(1) (West 2006).  In turn, the Administrative Code sets forth procedures for obtaining blood samples in DUI cases.  *Hall*, 2011 IL App (2d) 100262, ¶ 11 (citing 20 Ill. Adm. Code 1286.320 (2011)).  Failure to comply with section 11-501.2 and the regulations promulgated thereunder renders the results of chemical tests inadmissible in a DUI prosecution.  *Hall*, 2011 IL App (2d) 100262, ¶ 11.

¶ 64  Section 11-501.2 governed the chemical testing in *Hall* because it was performed at the request of the police or the police laboratory.  A lack of evidence that the blood draw was conducted in accordance with the regulations promulgated under section 11-501.2 rendered the test results inadmissible.  *Hall*, 2011 IL App (2d) 100262, ¶¶ 13-16.

¶ 65  Setting aside defendant's argument that the State here failed to present evidence of compliance with section 11-501.2, we conclude that the statute did not bar admission of the test results.  This case is more analogous to *Beck*, which was governed by section 11-501.4.  Section 11-501.4(a) of the Vehicle Code provides in relevant part as follows:

> "Notwithstanding any other provision of law, the results of blood, other bodily substance, or urine tests performed for the purpose of determining the content of alcohol, other drug or drugs, or intoxicating compound or compounds, or any combination thereof, of an individual's blood or urine conducted upon persons receiving medical treatment in a hospital emergency room are admissible in evidence as a business record exception to the hearsay rule only in prosecutions for any violation of Section 11-501 of this Code *** when each of the following criteria are met:

(1) the chemical tests performed upon an individual's blood or urine were ordered in the regular course of providing emergency medical treatment and not at the request of law enforcement authorities;

(2) the chemical tests performed upon an individual's blood or urine were performed by the laboratory routinely used by the hospital; and

(3) results of chemical tests performed upon an individual's blood or urine are admissible into evidence regardless of the time that the records were prepared." 625 ILCS 5/11-501.4(a) (West 2014).

¶ 66    The purpose of section 11-501.4 is to ensure the reliability and integrity of the test results of a defendant charged with DUI. *Beck*, 2017 IL App (4th) 160654, ¶ 84. Compliance with the statute demonstrates that reasonably protective measures have been taken to ensure that the blood or urine taken from the defendant and tested was not changed or substituted. *Beck*, 2017 IL App (4th) 160654, ¶ 84.

¶ 67    The *Beck* court upheld the admission of the BAC evidence because a physician ordered the blood draw while treating the defendant and " 'due to the nature of the incident that preceded his hospital visit,' rather than at the request of law enforcement." *Beck*, 2017 IL App (4th) 160654, ¶ 86.

¶ 68    The jury here heard evidence that the chemical tests were ordered in the regular course of providing emergency medical treatment to defendant, and he does not dispute that the tests were performed by the laboratory routinely used by the hospital. Therefore, we conclude that the trial court did not abuse its discretion in admitting the test results under section 11-501.4.

¶ 69    Defendant argues that who performs the collection, and not the reason for the collection, dictates whether section 11-501.2 or 11-501.4 must be followed. He emphasizes that, as in this

case, the samples in *Hall* were collected by medical personnel at a hospital. But the distinguishing fact is that *Hall* addressed police-ordered tests at the state police crime lab, while in this case and in *Beck*, the chemical testing was ordered in the regular course of providing emergency medical treatment, and not at the request of law enforcement authorities. Section 11-501.2 simply does not apply here.

¶ 70                                   C. One-Act, One-Crime

¶ 71    Defendant contends that the convictions of both aggravated PSMV and aggravated DUI violate the one-act, one-crime rule because both offenses are based on the single physical act of driving. In *People v. King*, 66 Ill. 2d 551, 566 (1977), our supreme court explained that a defendant may not be convicted of more than one offense based on a single physical act. An "act" is "any overt or outward manifestation which will support a different offense." *King*, 66 Ill. 2d at 566. The one-act, one-crime analysis is comprised of two steps: (1) the reviewing court must determine whether the defendant's conduct consisted of one physical act or separate physical acts and (2) if the conduct consisted of separate acts, the court must determine whether any of those offenses are lesser included offenses. *People v. Harvey*, 211 Ill. 2d 368, 389 (2004).

¶ 72    Defendant does not claim that aggravated DUI or aggravated PSMV is a lesser included offense, so we confine our analysis to whether his conduct consisted of one physical act. Defendant argues that he committed the single, continuous act of colliding with Clark and Pecoraro while fleeing the police. He claims that "[t]he act of driving away from police and into another vehicle in a matter of 10 to 15 seconds is 'one act' for purposes of the one-act-one-crime analysis" and that the status of the F-350 pickup as stolen and defendant's BAC and toxicology are merely "attendant circumstances" that do not constitute additional acts. We disagree.

¶ 73    In *People v. DiPace*, 354 Ill. App. 3d 104, 115-17 (2004), this court rejected the same argument defendant makes. DiPace was convicted of a Class 2 felony DUI and a Class 4 felony driving with a revoked license (DWLR). On appeal, DiPace argued that he could not be convicted of both offenses, because each was based on the single physical act of driving. This court noted that there is nothing criminal about driving, *per se*, and that, if DiPace "simply had been driving, then he would have committed no criminal act." *DiPace*, 354 Ill. App. 3d at 116. However, we noted, driving while intoxicated is a criminal act, as is driving with a revoked license. DiPace was sentenced based on those two separate, but simultaneous, acts and not based simply on his act of driving. Thus, it is a defendant's culpable physical act—one that will support an offense—that is the "act" for one-act, one-crime purposes. *DiPace*, 354 Ill. App. 3d at 116.

¶ 74    In *People v. Nunez*, 236 Ill. 2d 488 (2010), Nunez argued that *DiPace* was wrongly decided. Like defendant in this case, Nunez argued that the only physical act involved in both of his offenses was the driving of a car. The State responded "that it was not just the act of driving, but rather the act of driving plus the 'acts' of being intoxicated and having no valid license that constitute the multiple acts underlying [Nunez's] offenses." *Nunez*, 236 Ill. 2d at 495.

¶ 75    The *Nunez* court observed that the plain language of section 11-501(b-1)(2) of the Vehicle Code mandated that the penalty for Nunez's DWLR conviction be added to the penalty for his aggravated DUI conviction. *Nunez*, 236 Ill. 2d at 495. Nunez was convicted of DWLR based on his driving his vehicle while his driver's license was revoked for a previous violation of section 11-501(a). *Nunez*, 236 Ill. 2d at 495. He also violated section 11-501(a)(4) by driving his vehicle while he was under the influence of a drug or combination of drugs to a degree that rendered him incapable of driving safely. *Nunez*, 236 Ill. 2d at 495-96. The court concluded

that, "[w]hile other factors enhanced the offense to aggravated DUI, we have previously observed that there is but one offense of driving under the influence." *Nunez*, 236 Ill. 2d at 496 (citing *People v. Van Schoyck*, 232 Ill. 2d 330, 337 (2009)). The court affirmed the multiple convictions, because "[t]he legislature has expressly provided that the penalty for defendant's conviction for DWLR shall be in addition to the penalty for his conviction for aggravated DUI." *Nunez*, 236 Ill. 2d at 496.

¶ 76    Consistent with *DiPace* and *Nunez*, we conclude that defendant's conduct constitutes multiple acts supporting convictions of aggravated PSMV and aggravated DUI. Both offenses involve driving, but the driving is not itself a criminal act. Defendant's aggravated PSMV was based on knowingly driving the stolen F-350 pickup, disregarding the signal by police to stop, and attempting to flee the officers. In contrast, his aggravated DUI was based on driving under the influence and causing a motor vehicle accident that proximately caused great bodily harm or permanent disability or disfigurement to another. These are separate physical acts, and each offense can be completed independently of the other, regardless of whether defendant committed them simultaneously. See *DiPace*, 354 Ill. App. 3d at 116.

¶ 77                    D. Consecutive Sentences

¶ 78    The trial court imposed consecutive prison terms of 7 years for aggravated PSMV (625 ILCS 5/4-103.2(a)(7)(A) (West 2014)), 10 years for aggravated DUI (625 ILCS 5/11-501(d)(1)(C) (West 2014)), and 3 years for failure to report a motor vehicle accident involving personal injury (625 ILCS 5/11-401(b) (West 2014)). The court imposed concurrent two-year prison terms for one count of attempted theft (720 ILCS 5/8-4(a), 16-1(a)(1)(C) (West 2014)), two counts of aggravated assault (720 ILCS 5/12-2(c)(8) (West 2014)), and one count of criminal damage to government supported property (720 ILCS 5/21-1.01(a)(1) (West 2014)),

with these four terms to be served consecutively to the other sentences. The result was an aggregate sentence of 22 years' imprisonment.

¶ 79    Defendant contends that the trial court erred in imposing consecutive sentences of 7 years for aggravated PSMV and 10 years for aggravated DUI. Defendant asserts that consecutive sentences are improper because "both offenses involved the same conduct and both offenses were completed at the same moment—the personal injury accident."

¶ 80    Ordinarily, multiple sentences of imprisonment shall run concurrently unless determined otherwise by the sentencing court. 730 ILCS 5/5-8-4(a) (West 2014). Consecutive sentences are mandatory where "[o]ne of the offenses for which the defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5-8-4(d)(1) (West 2014).

¶ 81    Defendant was convicted of aggravated PSMV, which is a Class 1 felony (625 ILCS 5/4-103.2(c) (West 2014)), based on his knowingly driving the stolen F-350 pickup, disregarding the signal by police to stop, and attempting to flee the officers. The evidence proved beyond a reasonable doubt that defendant, in doing so, inflicted severe bodily injury to Clark, which mandated consecutive sentencing under section 5-8-4(d)(1).

¶ 82    Defendant's aggravated DUI under section 11-501(d)(1)(C) is a Class 4 felony (625 ILCS 5/11-501(d)(2)(A) (West 2014)), punishable by a prison term of 1 to 12 years (625 ILCS 5/11-501(d)(2)(F) (West 2014)). The aggravated DUI was based in part on his causing great bodily harm or permanent disability or disfigurement to Clark. The single injury to Clark thus elevated the offense to aggravated DUI and mandated consecutive sentencing on the aggravated PSMV. Defendant claims that this constitutes an improper double enhancement. We disagree.

¶ 83    A factor implicit in the offense of which a defendant has been convicted cannot be used as an aggravating factor.  See *People v. Phelps*, 211 Ill. 2d 1, 11-12 (2004) ("a single factor cannot be used both as an element of an offense and as a basis for imposing 'a harsher sentence than might otherwise have been imposed' " (quoting *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992))).    When such a factor is used for a dual purpose, it is referred to as a double enhancement, which is improper.  *Phelps*, 211 Ill. 2d at 12.  As in *Phelps*, the consecutive sentencing order in this case was premised on the infliction of severe bodily injury.  In both cases, no double enhancement occurred, because consecutive sentencing is not a sentencing enhancement.  *Phelps*, 211 Ill. 2d at 14.  Consecutive sentencing alters the manner in which a sentence is to be served, not the actual sentence.  *Phelps*, 211 Ill. 2d at 14.

¶ 84    Where consecutive sentencing is mandated because one of the offenses is a Class X or Class 1 felony and the defendant inflicted severe bodily injury, the defendant must have inflicted the severe bodily injury in the course of committing the Class X or Class 1 felony.  *Phelps*, 211 Ill. 2d at 15.  The State need not prove that the severe bodily injury resulted from the other offense, in this case aggravated DUI.  *Phelps*, 211 Ill. 2d at 16 (any Class X or Class 1 felony that results in severe bodily injury to the victim of that felony triggers consecutive sentences).  Here, defendant's proximately causing great bodily harm was an element of aggravated DUI, but the same injury was not an element of aggravated PSMV.  The infliction of severe bodily injury in the course of committing aggravated PSMV merely altered the manner in which the sentence for that offense was to be served.

¶ 85    Defendant argues that *People v. Lavallier*, 187 Ill. 2d 464 (1999), compels the merger of the two counts because there was one accident.  We disagree.  Lavallier was convicted and sentenced on two counts of aggravated DUI based on one accident, which consisted of identical

conduct but two separate victims. *Lavallier*, 187 Ill. 2d at 466-67. The court vacated one conviction and sentence on the ground that, although the legislature had intended to punish more severely those driving under the influence who cause motor vehicle accidents involving injuries to others, the legislature had not intended to impose multiple convictions and sentences based merely on multiple victims. *Lavallier*, 187 Ill. 2d at 471. This case is distinguishable in that defendant was convicted and sentenced on only one count of aggravated DUI related to Clark.

¶ 86                                    III. CONCLUSION

¶ 87    We hold that the State proved defendant guilty beyond a reasonable doubt of failing to report a motor vehicle accident involving personal injury; the trial court did not abuse its discretion in admitting the hospital's chemical test results; defendant's convictions of aggravated DUI and aggravated PSMV do not violate the one-act, one-crime rule; and the trial court did not err in imposing consecutive sentences for aggravated DUI and aggravated PSMV.

¶ 88    For the reasons stated, the judgment of the circuit court of Lake County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed the state's attorney fee of $50 under section 4-2002(a) of the Counties Code (55 ILCS 5/4-2002(a) (West 2016)) for the cost of this appeal. See *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 89    Affirmed.